1   Christopher Eaton (*pro hac vice*)
    Earthjustice
2   705 Second Avenue, Suite 203
    Seattle, WA 98104
3   T: 206-343-7340  F: 206-343-1526
    ceaton@earthjustice.org

4
    Brettny Hardy (CSB No. 316231)
5   Earthjustice
    50 California Street, Suite 500
6   San Francisco, CA 94111
    T: 415-217-2000  F: 415-217-2040
7   bhardy@earthjustice.org

8   *Counsel for Plaintiffs Healthy Gulf, Center for
    Biological Diversity, Defenders of Wildlife, and Friends
9   of the Earth*

10  Devorah Ancel (CSB No. 261038)
    Sierra Club
11  6406 North IH-35, Suite 1806
    Austin, TX 78752
12  T: 415-845-7847  F: 510-208-3140
    devorah.ancel@sierraclub.org

13
    *Counsel for Plaintiffs Sierra Club and Healthy Gulf*
14
    David Pettit (CSB No. 67128)
15  Natural Resources Defense Council
    1314 2nd Street
16  Santa Monica, CA 90401
    T: 310-434-2300  F: 888-875-6868
17  dpettit@nrdc.org

18  *Counsel for Plaintiff Natural Resources Defense
    Council*
19
    Catherine Wannamaker (*pro hac vice*)
20  Southern Environmental Law Center
    463 King Street, Suite B
21  Charleston, SC 29403
    T: 843-720-5270  F: 843-414-7039
22  cwannamaker@selcsc.org

23  *Counsel for Plaintiffs North Carolina Coastal
    Federation and South Carolina Coastal Conservation
24  League*

25

26

27

28

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL, HEALTHY GULF, CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, FRIENDS OF THE EARTH, NORTH CAROLINA COASTAL FEDERATION, and SOUTH CAROLINA COASTAL CONSERVATION LEAGUE,

    *Plaintiffs,*

    v.

SCOTT ANGELLE in his official capacity as DIRECTOR of the BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT, BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT, DAVID BERNHARDT in his official capacity as SECRETARY of the INTERIOR, and DEPARTMENT OF THE INTERIOR,

    *Defendants.*

Case No. 3:19-cv-03263-RS

**FIRST AMENDED COMPLAINT
ADMINISTRATIVE PROCEDURE ACT
CASE**

1. Plaintiffs Sierra Club, Natural Resources Defense Council, Healthy Gulf, Center for Biological Diversity, Defenders of Wildlife, Friends of the Earth, North Carolina Coastal Federation, and South Carolina Coastal Conservation League challenge the unlawful decision by Director of the Bureau of Safety and Environmental Enforcement ("BSEE") Scott Angelle, acting pursuant to his delegated authority from the Secretary of the Interior, to issue the Blowout Preventer Systems and Well Control Revisions ("Partial Repeal") final rule, 84 Fed. Reg. 21,908 (May 15, 2019), in violation of the Administrative Procedure Act, Outer Continental Shelf Lands Act, National Environmental Policy Act, and Endangered Species Act.

2. The 2010 *Deepwater Horizon* disaster laid bare many critical, pervasive weaknesses in offshore drilling safety regulations, practices, and technology.  Those defects resulted in a loss of well control and blowout that tragically killed eleven people and resulted in the largest and most destructive offshore oil spill in U.S. history, a spill which lasted for 87 days and leaked over 130

million gallons of oil into the Gulf of Mexico.

3.      In March of 2010, just before the spill, the Inspector General published a report on the regulatory body that oversaw offshore drilling safety at that time—the Minerals Management Service ("MMS")—detailing a culture of corruption and industry self-regulation within the agency. For example, the Inspector General's 2010 report found that oil industry personnel were often allowed to fill in their own safety inspection reports.  The report further explained that regulators were often bribed by industry with meals, tickets to sporting events, and gifts while they were overseeing the industry.  As another example, government inspectors were found to often be conducting inspections while simultaneously negotiating jobs with the drilling companies being inspected.

4.      In addition to the Inspector General's findings of corruption within MMS, expert panels convened in the 2010 disaster's aftermath identified several flawed drilling practices and equipment design failures that directly caused the blowout.  The panels found, however, that the overarching cause was a systemic failure of regulatory oversight.

5.      To begin addressing those problems, BSEE—an agency created in an effort to reform the corruption and industry-coziness that had existed within MMS—promulgated the Blowout Preventer Systems and Well Control final rule ("2016 Well Control Rule") in 2016.  The rule required drilling operators to implement many of the drilling practices and technology upgrades the *Deepwater Horizon* panels had determined were necessary to improve safety and avoid a similar disaster.  BSEE obtained substantial public and industry input, and considered a weighty amount of evidence and scientific studies in evaluating and determining the necessity of each provision in the rule for ensuring safety; in fact, it took BSEE nearly six years to finalize this rule given the substantial amount of information before the agency.  BSEE ultimately concluded that the rule would reduce the risks of worker deaths and oil spills, and would provide a net cost benefit to both society and to the oil and gas industry.

6.      Now, less than three years after the 2016 Well Control Rule was issued—and before several of its provisions have gone into effect—BSEE has repealed many of the Rule's critical components.  The Partial Repeal eliminates many standards for critical safety components like

blowout preventers, equipment inspection, and well monitoring, and will, in some cases, allow drilling operators to determine for themselves which safety measures to adopt—similar to the regime that existed for those components when the *Deepwater Horizon* disaster occurred (and to the culture of industry self-regulation criticized extensively in the 2010 Inspector General's report).

7.      BSEE is rolling back these safety measures at the same time the Department of the Interior is working to expand oil and gas drilling off the California, Alaska, and Gulf of Mexico coasts, and to open up the U.S. Atlantic and Pacific coasts to new oil and gas development.

8.      BSEE failed to provide any good reason or rational basis for retreating from the 2016 Well Control Rule.  The regulatory shift directly contradicts a number of findings BSEE made when it promulgated the 2016 Well Control Rule.  Most notably, BSEE's claims that the Partial Repeal does not reduce safety disregard the agency's prior science-based conclusions that each provision is "necessary" to ensure safety and would contribute to a significant reduction in the risks of worker deaths and oil spills.  BSEE provided no evidentiary support or reasoned basis for its new claims or for disregarding its prior factual findings.

9.      BSEE also engaged in covert rulemaking in promulgating the Partial Repeal, allegedly relying on information it did not disclose to the public, and adding industry's requested changes to the final rule without first noticing the changes for public comment as required by the Administrative Procedure Act.  BSEE's incorporation by reference of industry standards that are not readily available to the public similarly violates the Administrative Procedure Act's public transparency requirements.

10.     The Partial Repeal, without any justification, eliminates requirements that operators employ certain "best available and safest technologies," in violation of the Outer Continental Shelf Lands Act.

11.     BSEE violated the National Environmental Policy Act by failing to adequately consider the environmental effects of the Partial Repeal and irrationally ignoring the increased oil spill risk to conclude that the Partial Repeal would reduce harm to the environment.

12.     Finally, BSEE violated the Endangered Species Act by failing to consider the Partial Repeal's effects on threatened and endangered species and failing to insure, through consultation

FIRST AMENDED COMPLAINT

with the federal wildlife services, that the Partial Repeal will not jeopardize those species or adversely modify their critical habitats.

13. Planned oil and gas exploration and development off the Pacific, Atlantic, Alaska, and Gulf coasts will be made significantly more dangerous by the Partial Repeal, putting workers' lives, coastal communities, and the environment at substantial risk.

14. Plaintiffs therefore seek an order declaring the Partial Repeal final rule unlawful under the Administrative Procedure Act, Outer Continental Shelf Lands Act, National Environmental Policy Act, and Endangered Species Act, and vacating the Partial Repeal final rule.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

15. This case is brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, and Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(g)(1) (ESA), 43 U.S.C. § 1349(b) (OCSLA), and 28 U.S.C. § 1331 (federal question). This Court has authority to grant the requested relief in this case pursuant to the APA, 5 U.S.C. § 706, the ESA, 16 U.S.C. § 1540(g), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

16. Venue is appropriate under 28 U.S.C. § 1391(e)(1), as the lead Plaintiff resides in this District and the consequences of the challenged action will affect California.

17. This case is properly assigned to the San Francisco Division or the Oakland Division under Civil L.R. 3-2(c) because the lead Plaintiff resides in and other Plaintiffs have offices and members in counties within those divisions.

18. As required by the ESA and OCSLA, Plaintiffs provided Defendants a 60-day notice of their intent to sue on April 2, 2019, regarding Defendants' violations of those statutes. *See* 16 U.S.C. § 1540(g)(2)(A); 43 U.S.C. § 1349(a)(2). Defendants have not remedied the violations described in the 60-day notice.

## PARTIES

19. Plaintiff SIERRA CLUB is a not-for-profit organization dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use

of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  Sierra Club's headquarters are located in Oakland, California.  Sierra Club is one of the oldest and largest conservation groups in the country, with about 800,000 members nationally in 64 chapters in all of the 50 states, the District of Columbia, and Puerto Rico.  Sierra Club members use the public lands and waters throughout California, the Gulf of Mexico, and Atlantic coast, including those that would be affected by oil and gas activities, for quiet recreation, aesthetic pursuits, and spiritual renewal.  Sierra Club brings this action for itself and as representative of its members.

20.     Plaintiff NATURAL RESOURCES DEFENSE COUNCIL, INC. ("NRDC") is a national, nonprofit environmental organization with nearly 400,000 members, including over 70,000 members in California.  NRDC has offices in San Francisco and Santa Monica, California, among other locations.  NRDC is dedicated to the preservation of the environment, its wildlife, and its natural resources, and actively pursues effective enforcement of environmental laws and regulations on behalf of its members.  NRDC has been involved in litigation and other advocacy arising from the *Deepwater Horizon* accident and has filed comments with BSEE on well safety and related issues. NRDC brings this action for itself and as representative of its members.

21.     Plaintiff HEALTHY GULF is a network of community, conservation, environmental, and fishing groups and individuals committed to empowering people to protect and restore the natural resources of the Gulf of Mexico.  Healthy Gulf has been actively involved in efforts to strengthen oversight of the offshore oil and gas industry and end new oil and gas leasing.  Healthy Gulf has offices in New Orleans, Louisiana; Pensacola, Florida; and Jackson, Mississippi.  Healthy Gulf's members are located throughout the United States, and regularly use the ocean waters and coastal areas throughout the Gulf of Mexico, as well as along the Atlantic and Pacific coasts. Healthy Gulf brings this action for itself and as representative of its members.

22.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a nonprofit corporation that maintains offices across the country, including in: Oakland, Los Angeles, Joshua Tree, and Petaluma, California; Arizona; Florida; New York; Oregon; Washington; Washington, D.C.; and Baja California Sur, Mexico.  The Center advocates for the protection of threatened and

endangered species and their habitats through science, policy, and environmental law.  The Center's mission also includes protecting air quality, water quality, and public health.  The Center's Oceans Program focuses specifically on conserving marine ecosystems, and seeks to ensure that imperiled species such as marine mammals, corals, and sea turtles are properly protected from destructive practices in our oceans.  The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices.  In pursuit of this mission, the Center has been actively involved in protecting the California, Alaska, and Atlantic coasts as well as the Gulf of Mexico from the harmful impacts of offshore oil and gas drilling.  The Center has more than 67,300 members, including members who live and recreate throughout the California coast, Gulf of Mexico, Atlantic coast, and waters off Alaska.  The Center brings this action on behalf of itself and its members.

23.     Plaintiff DEFENDERS OF WILDLIFE ("Defenders") is a nonprofit, science-based conservation organization dedicated to the protection and restoration of all native wild animals and plants in their natural communities and the preservation of the habitats that they depend on.  Founded in 1947, it is one of the nation's leading advocates for imperiled species, including marine species such as whales, dolphins, sharks, and sea turtles, and their habitats.  Defenders is headquartered in Washington, D.C., with regional and field offices around the country in California, Oregon, Idaho, Washington, Alaska, Montana, Arizona, New Mexico, Colorado, Texas, North Carolina, and Florida.  Defenders has pursued an active litigation and legal advocacy strategy in the wake of the *Deepwater Horizon* catastrophe to challenge oil and gas leasing, exploration, and development in order to protect our nation's oceans and irreplaceable marine wildlife heritage from the harmful effects of offshore fossil fuel development.  Defenders has more than 408,000 members and donors nationwide, including members who live and recreate along the Alaskan, Atlantic, Pacific, and Gulf coasts.  Defenders brings this action for itself and as representative of its members.

24.     Plaintiff FRIENDS OF THE EARTH is a nonprofit organization with offices in Berkeley, California, and Washington, D.C.  For more than forty years, it has championed the causes of a clean and sustainable environment, protection of the nation's public lands and waterways, and the exposure of political malfeasance and corporate greed.  Friends of the Earth's Oceans and

Vessels Program works to fight industrialization of the ocean in all its forms, and has won regional, national and international limits on air, water, and oil pollution from cruise ships, cargo ships, oil tankers, ferries and recreational water craft. Friends of the Earth has more than 310,000 members, including members who live and recreate along the coastlines of California, the Gulf of Mexico, and the Atlantic seaboard. Friends of the Earth brings this action for itself and as representative of its members.

25.     Plaintiff NORTH CAROLINA COASTAL FEDERATION ("Federation") is a membership-supported, nonprofit organization with over 5,000 members. For more than thirty years, the Federation has worked to protect the quality of North Carolina's coastal environment, including its beaches, fisheries, and coastal and marine wildlife through advocacy, education, and coastal restoration projects. Protecting the North Carolina coast from offshore drilling is one of the Federation's organizational priorities, and it has engaged in substantial public education and advocacy efforts about the risks this activity would pose to North Carolina's environment and economies. The Federation brings this action for itself and as representative of its members.

26.     Plaintiff SOUTH CAROLINA COASTAL CONSERVATION LEAGUE ("League") is a nonprofit organization founded in 1989. The League is incorporated under the laws of South Carolina, maintains its headquarters office in Charleston, South Carolina, and currently has nearly 2,700 active donors. The mission of the League is to protect the threatened resources of the South Carolina coast—its natural landscapes, abundant wildlife, clean water, and quality of life. For years, the League has actively worked to prevent seismic surveying and offshore drilling off the coast of South Carolina, due to the many harms that these activities would cause the marine environment and wildlife. The League brings this action for itself and as representative of its members.

27.     Plaintiffs and Plaintiffs' members and staff regularly use, enjoy, and benefit from the marine and coastal environments along the Pacific, Atlantic, Alaska, and Gulf coasts, including waters within and adjacent to California. Plaintiffs and Plaintiffs' members and staff regularly enjoy and benefit from the presence of healthy marine and avian life—including threatened and endangered species—and ecosystems within those environments for recreational, aesthetic, commercial, scientific, and environmental purposes, including whale watching, bird watching,

1    scientific study, boat touring, underwater diving, fishing, photography, and beach bathing. The

2    Partial Repeal will directly and irreparably injure these interests. The abilities of Plaintiffs and

3    Plaintiffs' members and staff to pursue these interests hinges on the health of the marine, coastal,

4    and estuarine ecosystems (with clean water and oil-free beaches) and the well-being of the species

5    that live, migrate, feed, and breed in areas affected by oil and gas activities. The Partial Repeal will

6    increase the likelihood of offshore drilling accidents and oil spills that harm the health of these

7    ecosystems and species. BSEE has issued the Partial Repeal without a full and accurate analysis of

8    its environmental impacts or reasoned consideration of how to avoid or mitigate those impacts. The

9    Department of the Interior ("Interior") has authorized and continues to authorize oil and gas

10   activities off the California and Alaska coasts and in the western and central Gulf of Mexico, and has

11   proposed to vastly expand offshore oil and gas activities into nearly all federal waters—including the

12   Atlantic, eastern Gulf of Mexico, and northern Pacific. Oil and gas operations in all of these areas

13   are governed by the Partial Repeal. Therefore, Interior is and will continue to enable new oil and gas

14   development without adequate safeguards in place to prevent harm to the environment in which

15   Plaintiffs and Plaintiffs' members and staff have an interest. The interests of Plaintiffs and

16   Plaintiffs' members and staff have been, are being, and will be adversely affected by BSEE's

17   violations of federal law, as described herein. These harms can only be remedied if BSEE is forced

18   to comply with the requirements of the APA, OCSLA, the National Environmental Policy Act

19   ("NEPA"), and the ESA. Additionally, Plaintiffs and their members regularly comment on agency

20   actions involving offshore oil and gas drilling, and regularly comment on and participate in BSEE's

21   and Interior's decisions and environmental analyses regarding offshore oil and gas drilling. BSEE's

22   failure to comply with the APA, OCSLA, NEPA, and the ESA deprives them of these rights, and

23   causes them procedural and informational injuries. These harms can only be remedied if BSEE is

24   forced to comply with the requirements of the APA, OCSLA, NEPA, and the ESA. Plaintiffs have

25   no other adequate remedy at law.

26        28.    Defendant SCOTT ANGELLE is sued in his official capacity as Director of BSEE.

27   The Director is the official to whom the Secretary of the Interior has delegated authority to regulate

28   oil and gas exploration, development, and production operations on the Outer Continental Shelf

under OCSLA.  The Director authorized BSEE's issuance of the Partial Repeal final rule.  The Director is required to comply with NEPA when taking any action affecting the environment and with the ESA when taking any action that may affect threatened or endangered species, or critical habitat.

29.     Defendant BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT is the agency to which the Secretary of the Interior has delegated authority to regulate oil and gas exploration, development, and production operations on the Outer Continental Shelf under OCSLA.  BSEE is the agency that issued the Partial Repeal final rule.  BSEE is required to comply with NEPA when taking any action affecting the environment and with the ESA when taking any action that may affect threatened or endangered species, or critical habitat.

30.     Defendant DAVID BERNHARDT is sued in his official capacity as Secretary of the Interior.  He is the chief officer of the Department of the Interior charged with overseeing the proper administration and implementation of OCSLA.  OCSLA vests authority in the Secretary of the Interior to issue rules and regulations necessary to carry out the statute's provisions.  OCSLA also vests authority in the Secretary of the Interior to issue rules and regulations to ensure protection of safety, health, and the environment in oil and gas exploration, development, and production operations on the Outer Continental Shelf under OCSLA.  The Partial Repeal final rule was issued pursuant to the Secretary of the Interior's authority under OCSLA.  The Secretary of the Interior is required to comply with NEPA when taking any action affecting the environment and with the ESA when taking any action that may affect threatened or endangered species, or critical habitat.

31.     Defendant DEPARTMENT OF THE INTERIOR is the department charged with properly administering and implementing OCSLA.  OCSLA vests authority in Interior to issue rules and regulations necessary to carry out the statute's provisions.  OCSLA also vests authority in Interior to issue rules and regulations to ensure protection of safety, health, and the environment in oil and gas exploration, development, and production operations on the Outer Continental Shelf under OCSLA.  The Partial Repeal final rule was issued pursuant to Interior's authority under OCSLA.  Interior is required to comply with NEPA when taking any action affecting the

environment and with the ESA when taking any action that may affect threatened or endangered species, or critical habitat.

## STATUTORY BACKGROUND

### I.   Outer Continental Shelf Lands Act

32.   OCSLA governs the leasing, exploration, and development of oil and gas deposits on the Outer Continental Shelf.  43 U.S.C. § 1331 *et seq.*  The Outer Continental Shelf extends from the outer boundary of state waters—typically three miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore.  *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10,605, 10,605 (Mar. 14, 1983).

33.   In 1978, Congress amended OCSLA to provide, in part, for the development of resources on the Outer Continental Shelf "subject to environmental safeguards."  43 U.S.C. § 1332(3); *see* Pub. L. No. 95-372, 92 Stat. 629 *et seq.*, 43 U.S.C. § 1331 *et seq.*

34.   One of OSCLA's primary purposes is to ensure that all operations in the Outer Continental Shelf "be conducted in a safe manner . . . using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, . . . or other occurrences which may cause damage to the environment or to property, or endanger life or health."  43 U.S.C. § 1332(6).

35.   OSCLA charges the Secretary of the Interior with leasing and managing oil and gas rights and activities on the Outer Continental Shelf.  *E.g.*, 43 U.S.C. §§ 1334, 1337.

36.   OCSLA authorizes the Secretary to "prescribe such rules and regulations as may be necessary" to manage oil and gas rights and activities, including regulations governing "drilling or easements necessary for exploration, development, and production."  *Id.* § 1334(a).  The Secretary also can issue regulations necessary to ensure safety, environmental protection, and conservation of natural resources.  *Id.*

37.   OCSLA imposes a nondiscretionary duty on the Secretary to "require, on all new drilling and production operations and, wherever practicable, on existing operations, the use of the best available and safest technologies ["BAST"] which the Secretary determines to be economically feasible, wherever failure of equipment would have a significant effect on safety, health, or the

environment." *Id.* § 1347(b).  Only when the Secretary "determines that the incremental benefits are *clearly* insufficient to justify the incremental costs of utilizing such technologies" can the Secretary decline to require BAST.  *Id.* (emphasis added).

38.     The Secretary has delegated to BSEE the authority to enact and enforce safety and environmental standards under OCSLA.  30 C.F.R. § 250.101 (2011).

39.     BSEE has promulgated regulations governing "oil, gas, and sulphur exploration, development, and production operations on the [Outer Continental Shelf]," contained in 30 C.F.R. Part 250.  *Id.* § 250.102(a) (2016).  Under the regulations, lessees or their designated operators are required to "submit requests, applications, and notices, or provide supplemental information for BSEE approval" before conducting any operations on the Outer Continental Shelf.  *Id.*

40.     Specifically, lessees or their designated operators must obtain BSEE approval in the form of a "Permit to Drill" before taking any action to "sidetrack, bypass, or deepen a well."  *Id.* § 250.410 (2011).

41.     Lessees or their designated operators also must obtain BSEE approval in the form of a "Permit to Modify" before performing any operation under a plan to "revise [a] drilling plan, change major drilling equipment, or plugback."  *Id.* § 250.465(a)(1) (2016).

42.     The safety regulations in Part 250 require lessees or their designated operators to take certain actions to ensure safety when requesting BSEE approvals and when conducting operations pursuant to those approvals.  *E.g.*, *id.* §§ 250.414(c), .420, .700 (2016).  BSEE's implementing regulations also require operators to use BAST on all new exploration, development, and production operations and whenever practical on existing operations by, *inter alia,* requiring that operations comply with existing BSEE regulations.  *Id.* § 250.107(c).

## II.     National Environmental Policy Act

43.     NEPA is this country's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1 (1979); *see* 42 U.S.C. § 4331 *et seq.*  Its purpose is to "promote efforts which will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.  It makes environmental protection a part of the mandate of every federal agency.  *Id.* § 4332(1).

44. The Council on Environmental Quality has promulgated regulations implementing NEPA, which are "binding on all Federal agencies." 40 C.F.R. § 1500.3 (1979); *see id.* §§ 1500.1–1508.28 (1986).

45. Congress enacted NEPA to ensure that federal agencies incorporate environmental concerns into the decisionmaking process. 42 U.S.C. § 4331(a)–(b). To that end, NEPA compels agencies to evaluate prospectively the environmental impacts of proposed actions that they carry out, fund, or authorize, and give the public a meaningful opportunity to participate in the decisionmaking process. Agencies must "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b) (1979).

46. NEPA requires each federal agency to prepare an "environmental impact statement" ("EIS") for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Significan[ce]" depends on a number of factors, including the level of controversy surrounding the impact of the action, the presence of unique or uncertain risks, the potential for the action to establish precedent for future actions, whether the action has cumulatively significant impacts, and the possibility for adverse effects on an endangered or threatened species. 40 C.F.R. § 1508.27 (1979). The presence of any one of these factors is sufficient to require an EIS.

47. The EIS must describe: (1) the "environmental impact of the proposed action"; (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented"; (3) alternatives to the proposed action; (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1502.1 (1979).

48. When an agency is uncertain whether an impact will be significant, it may prepare an environmental assessment ("EA") to evaluate these criteria and determine whether a full EIS is required. *Id.* § 1508.9(a)(1) (1979). If, through preparation of an EA, the agency concludes that an EIS is not necessary, it must issue a finding that adequately explains why the project will "not have a

significant effect on the human environment." *Id.* § 1508.13 (1979).  If an action may have a significant effect on the environment, or if there are substantial questions about whether it may, an agency must prepare an EIS.

49.     Agencies' NEPA analyses "must 'take a "hard look" at [the] environmental consequences' of their actions, and 'provide for broad dissemination of relevant environmental information.'"  *Pub. Emps. for Envtl. Responsibility v. Hopper*, 827 F.3d 1077, 1082 (D.C. Cir. 2016) (alteration in original) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)); *accord N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006).  In taking the "hard look" NEPA requires, the analyses must fully consider and disclose the potential environmental impacts of proposed actions and alternatives to those actions.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.4, 1502.1(b), (c), 1502.5 (1979).

50.     NEPA requires agencies to use high-quality, accurate scientific information and to ensure the scientific integrity of their analyses.  40 C.F.R. §§ 1500.1(b), 1502.24 (1979).

51.     An agency's NEPA analysis must, among other things, include a "full and fair" discussion of all direct and indirect environmental impacts.  *Id.* §§ 1502.1, 1508.8, 1508.25 (1979).  The agency must consider the site-specific impacts of the action as well as the cumulative impacts of the proposed action.  *Id.* §§ 1508.7, 1508.8, 1508.25, 1508.27 (1979).

52.      Direct effects are those effects "which are caused by the action and occur at the same time and place." *Id.* § 1508.8(a).  Indirect effects are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.* § 1508.8(b).  Cumulative effects are those that "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  *Id.* § 1508.7.

53.     "Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative."  *Id.* § 1508.8.  Such effects "can result from individually minor but collectively significant actions taking place over a period of time."  *Id.* § 1508.7.

54.     An agency's NEPA analysis must also analyze reasonable alternatives that would avoid or minimize the action's adverse impacts, *id.* § 1502.1, and set out measures to mitigate those adverse effects, *id.* § 1502.14(f) (1979).  The agency's alternatives analysis must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  *Id.* § 1502.14.

55.     NEPA requires agencies to disclose and analyze measures to mitigate the impacts of proposed actions.  42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. §§ 1502.14(f), 1502.16(h) (1979).  An agency's analysis of mitigation measures must be reasonably complete in order to properly evaluate the severity of the adverse effects of an agency's proposed action and to inform the public and decisionmakers of ways to avoid or minimize harmful effects prior to the agency making a final decision.  *See* 40 C.F.R. §§ 1502.1, 1502.16, 1508.20 (1979).

56.     NEPA requires that an agency incorporate its environmental analysis into its decisionmaking process.  "NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action."  *Id.* § 1500.1(c); *see also id.* ("Ultimately . . . it is not better documents but better decisions that count."); *id.* § 1502.1 ("primary purpose of an [EIS] is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. . . . An environmental impact statement is more than a disclosure document.  It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.").

### III.     Endangered Species Act

57.     Congress enacted the ESA to protect endangered and threatened species and the ecosystems on which those species depend.  16 U.S.C. § 1531(b).  Through the ESA, Congress declared its policy "that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the Act]."  *Id.* § 1531(c)(1).

58.     The ESA provides protection to those species the federal wildlife services—the U.S. Fish and Wildlife Service and the National Marine Fisheries Service—designate as either

"endangered" or "threatened," as well as to those species' designated "critical habitats." A species is endangered when it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is threatened if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). Critical habitat is that which contains "physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." *Id.* § 1532(5). *See generally id.* § 1533.

59.     Section 7(a)(2) of the ESA imposes a continuing and affirmative duty on each federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Id.* § 1536(a)(2). An "action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including the promulgation of regulations. 50 C.F.R. § 402.02.

60.     The ESA and its implementing regulations establish an interagency consultation process to assist federal agencies in complying with this duty. An agency must consult with the appropriate wildlife service whenever it takes an action that "may affect" a listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.12, 402.14(a).

61.     The agency must consider all possible effects across the "action area," which encompasses "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. The "effects of the action" that must be considered include "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." *Id.* "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.*

62.     "The minimum threshold for an agency action to trigger consultation with [the wildlife services] is low . . . ." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). "*Any possible effect* . . . triggers the formal consultation requirement . . . ." Interagency Cooperation—Endangered Species Act of 1973, as Amended, 51 Fed. Reg. 19,926, 19,949 (June 3,

1986) (emphasis added); *see also* U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook* at xvi (1998) ("May affect [is] the appropriate conclusion when a proposed action *may* pose any effects on listed species or designated critical habitat.").

63.     As a result of consultation, the federal agency will obtain either a written concurrence from the wildlife service that the proposed action is "not likely to adversely affect" listed species or their critical habitats, 50 C.F.R. §§ 402.13(a), 402.14(b)(1), or, if the action is likely to adversely affect listed species or their habitats, a biological opinion evaluating those effects and determining whether the action is likely to jeopardize the continued existence of the listed species or adversely modify critical habitat, *id.* § 402.14(h).

64.     The biological opinion will contain, in addition to the required analysis, any reasonable and prudent alternatives necessary to mitigate the proposed action so as to avoid jeopardy and/or adverse modification of critical habitat.  16 U.S.C. § 1536(b)(3).  Each biological opinion also must include an incidental take statement specifying the permissible level of incidental take,[1] as well as any measures the wildlife service considers necessary or appropriate to minimize the effects of the action on threatened or endangered species.  *Id.* § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i).

65.     Compliance with the procedural provisions of the ESA—identifying the likely effects of the action through the consultation process—is integral to compliance with the substantive requirements of the Act.  Under the statutory framework, federal actions that "may affect" a listed species or critical habitat may not proceed unless and until the federal agency ensures, through completion of the consultation process, that the action is not likely to cause jeopardy or adverse modification of critical habitat.  16 U.S.C. § 1536(a); 50 C.F.R. §§ 402.14; 402.13; *see also* 16 U.S.C. § 1536(d).

IV.     **Administrative Procedure Act**

66.     The APA governs federal agencies' rulemaking processes.  5 U.S.C. § 553.

---

[1] Incidental taking is the harassment, harm, wounding, killing, or similar harms that "result from, but are not the purpose of, carrying out an otherwise lawful activity."  16 U.S.C. § 1532(18); 50 C.F.R. § 402.02.

67. An agency must give the public adequate notice of any rulemaking, which must include "the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(3). After providing notice, the agency must give "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c).

68. The agency's final rule must be a "logical outgrowth" of the terms of the proposed rule. *E.g.*, *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983). And the agency "must respond in a reasoned manner to those [comments] that raise significant problems" in order to ensure it has based its decision "on a consideration of the relevant factors." *City of Waukesha v. EPA*, 320 F.3d 228, 257–58 (D.C. Cir. 2003) (citation omitted).

69. The APA also governs judicial review of agency rulemaking. The statute confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

70. The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

71. If an agency reverses course by revising or repealing a regulation, it is "obligated to supply a reasoned analysis for the change." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). Further, an agency must show that "there are good reasons" for the reversal. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* "[A]n agency may not simply discard prior factual findings without a reasoned explanation" when changing a policy. *Organized Vill. of Kake v. U.S. Dept. of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015).

72. The adequacy of an agency's NEPA analysis and its administration of OCSLA are reviewed pursuant to the APA.

**STATEMENT OF FACTS**

I.     **Offshore Drilling Poses a Threat to the Marine Environment and Coastal Communities Along Nearly the Entire U.S. Coastline.**

73.     The oceans and coastlines of the United States provide extraordinary aesthetic, economic, and environmental resources to the coastal states and to the nation.  They support a diverse array of wildlife, robust fisheries, and vibrant tourism economies, as well as countless other values.  The country's coastal communities depend on clean waters and healthy ecosystems for their livelihoods.

74.     Offshore oil and gas drilling threatens these values and communities with oil spills, habitat degradation, and other harmful effects.  Offshore drilling is also one of the most dangerous occupations in the country, putting workers' lives at risk.

75.     President Trump in 2017 directed the Secretary of the Interior to implement an "America-First Offshore Energy Strategy" that included considering revising the current leasing plan to include "annual lease sales, to the maximum extent permitted by law, in . . . [the] Western Gulf of Mexico, Central Gulf of Mexico, Chukchi Sea, Beaufort Sea, Cook Inlet, Mid-Atlantic, and South Atlantic."  Exec. Order No. 13795, 82 Fed. Reg. 20,815, 20,815 (May 3, 2017).

76.     This announcement by President Trump is just the latest development in an extensive history of oil and gas drilling off the nation's coasts.  The federal government held the first two lease sales for oil and gas development rights off the Southern California coast in 1966 and 1968.  One year later, in 1969, drilling on one of the leases triggered a blowout and resulted in the catastrophic Santa Barbara oil spill.  That spill discharged approximately 3 million gallons of oil into the ocean that killed thousands of marine mammals, birds, and fish, and marred 35 miles of coastline.

77.     The government continued selling leases on the Outer Continental Shelf in the Southern California region through 1984.  As of this date, there are 34 active leases in federal waters off the Southern California coast, and 23 platforms.

78.     Although these platforms were installed decades ago, they continue to conduct new drilling operations.  BSEE has approved over 200 new Permits to Modify approved drilling plans in the Pacific region between 2016 and this date.

79.     The federal government first offered leases for sale on the Outer Continental Shelf off Alaska in 1976.  It continues to hold lease sales periodically in various regions off the state's coast.

80.     As of this date, there are 54 active leases in the Alaska region.  BSEE has approved new Permits to Drill on the Outer Continental Shelf off the Alaska coast as recently as 2017. Interior recently approved the first offshore oil and gas development project from fully within federal waters in the Arctic Ocean.

81.     The Gulf of Mexico is home to extensive oil and gas development.  The federal government began leasing oil and gas rights in the Gulf in 1954.  Today, there are nearly 3,000 oil and gas platforms working on over 2,500 active leases covering about 14 million acres of the Gulf.

82.     Interior holds biannual lease sales on the Outer Continental Shelf in the Gulf, while BSEE approves thousands of Permits to Drill and Permits to Modify in the region each year.

83.     The current 2017–2022 leasing program calls for two lease sales each year in the Gulf of Mexico and one lease sale in the Cook Inlet area off the Alaska coast.

84.     Since 2017, the Trump administration has vigorously pursued efforts to greatly expand oil and gas development along virtually the entire coast of the United States.  Pursuant to that effort, Interior has issued a Draft Proposed OCS Oil and Gas Leasing Program (2019–2024) that would offer 6 lease sales off the California coast, 1 lease sale off the Oregon and Washington coasts, 19 lease sales off the Alaska coast, 9 lease sales off the Atlantic coast, and 12 lease sales off the Gulf coast over the next five years.  83 Fed. Reg. 829, 830 (Jan. 8, 2018).  This Draft Proposed Program includes the largest number of proposed offshore leases in U.S. history.

85.     Lessees or their designated operators seeking to conduct oil and gas operations under existing leases, leases to be issued under the 2017–2022 leasing program, or leases that could be issued in new areas opened to drilling under the 2019–2024 leasing program will be subject to BSEE's regulations in 30 C.F.R. Part 250.

86.     The risks of well blowouts, catastrophic oil spills, and other offshore accidents along nearly the entire U.S. coastline, therefore, depend on the safety measures required by BSEE's regulations.

II.     **Human and Technical Failures Caused the *Deepwater Horizon* to Suffer a Catastrophic Well Blowout.**

87.     On April 20, 2010, a series of human and mechanical failures culminated in an explosion that tore through the *Deepwater Horizon* oil drilling rig, tragically killing eleven people. The explosion caused the rig to sink and oil to gush from the seabed, nearly 5,000 feet below the surface, for months, until the well finally was capped in mid-July 2010.  The result was the largest oil spill in the history of the United States and a cleanup and containment effort that at its height enlisted 50,000 workers on land and sea.

88.     The events leading up to the disaster began when the *Deepwater Horizon* crew performed steps to temporarily "abandon" the recently drilled well to allow for installation of production equipment on the well to extract oil and gas.  However, the drilling team did not properly install a surface cement plug to keep oil and gas below the seafloor.  The team subsequently misinterpreted the results of the cement integrity test.

89.     As the team removed drilling fluid, the pressure levels decreased in the well and allowed oil and gas to erupt through the failed cement barrier and onto the drilling rig floor—a well blowout.

90.     The team attempted to stop the well blowout by activating an emergency device on the seafloor known as a blowout preventer.  The blowout preventer had both manual and automatic mechanisms intended to shear the drill pipe and seal the well.  Both mechanisms were activated.

91.     However, the intense oil and gas pressure in the well caused the drill pipe to buckle, impeding the blowout preventer's mechanisms from properly functioning to seal the well.

92.     With the well control system incapacitated, the well gushed oil and gas into the Gulf of Mexico until engineers developed and installed a new containment system months later.

93.     Over the 87 days during which the well remained uncapped, more than 130 million gallons of oil and unquantified amounts of natural gas flowed freely into the Gulf.  The spill contaminated over 43,000 square miles of ocean waters and over 1,300 miles of shoreline in the Gulf.

94.     Scientists estimate the spill caused death or serious harm to billions, if not trillions, of animals, including over 100,000 individuals of species listed as threatened or endangered under the ESA.  The spill marred coastal, ocean bottom, and midwater habitats—some of which were designated critical habitat—causing severe damage to the ecosystems that support the Gulf's biodiversity and economy.  In response to the spill, government officials had to close over 88,000 square miles (over one-third of the Gulf) to commercial and recreational fishing for a period of time.

95.     The harms from the spill to marine and coastal species, the environment, and the Gulf economy persist to this day.

**III.    Expert Panels Recommend Drilling Safety Regulations in the *Deepwater Horizon* Disaster's Aftermath.**

96.     Several governmental and academic panels of experts were convened after the *Deepwater Horizon* disaster to investigate its causes and recommend safety improvements.  The reports produced by the panels highlight a lack of safety procedures, oversight, and equipment performance as leading causes of the blowout and spill.

97.     The National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling [hereinafter National Commission] noted in its Report to the President that industry had been given decades to regulate itself in terms of worker safety and environmental stewardship and had done neither.  *See generally* Nat'l Comm'n on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling, *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling*, Report to the President (2011).  It found that the federal government itself played a major role in creating the conditions for the disaster through lax policies and enforcement.  The National Commission concluded that "without effective government oversight, the offshore oil and gas industry will not adequately reduce the risk of accidents, nor prepare effectively to respond in emergencies."

98.     The National Commission and other panels agreed that major regulatory changes were necessary to create oversight independent from the industry being regulated.  The panels recommended the adoption of a safety inspection and certification regime overseen by a federal agency.  The National Academy of Engineering, in particular, recommended that the federal agency "develop requirements for determining the competence of examiners and their independence from

the operating company" and specify "responsibilities for developing well examination schemes, ensuring scheme effectiveness, and ensuring that appropriate actions are taken on recommendations made by the well examiner."  Nat'l Acad. of Eng'g, *Macondo Well Deepwater Horizon Blowout: Lessons for Improving Offshore Drilling Safety* 123 (2012).

99.     In addition to general oversight issues, the panels identified a number of specific human and technological failures that caused the *Deepwater Horizon* loss of well control and blowout, and recommended how such failures could be prevented through better government regulation.

100.     For example, the *Deepwater Horizon* drilling team had employed a very narrow well pressure gradient, known as a "drilling margin," which compromised its abilities to adjust to unforeseen well conditions and to safely seal the well.  The National Academy of Engineering recommended that the government prescribe a minimum "safe" drilling margin to prevent that problem.  *Id.* at 39–40, 43.

101.     The *Deepwater Horizon* operation also failed to use real-time monitoring and communication between the rig personnel and onshore engineers.  The National Commission found that onshore experts employing proper monitoring could have alerted the rig's drilling team to the well pressure problem and advised the team to take corrective action before the blowout occurred.  Nat'l Comm'n, *supra*, at 39.  That panel and others therefore recommended the federal government prescribe minimum real-time monitoring standards.

102.     The chain of human and engineering errors that occurred onboard the *Deepwater Horizon* rig would not have resulted in an uncontrolled oil spill had the blowout preventer system been designed to better respond to the conditions that occurred.  The National Academy of Engineering identified over one dozen deficiencies in the system's design, including that it had not been designed or tested for its actual use and that it lacked the ability to function if its primary mechanisms failed or it encountered unforeseen conditions.  Nat'l Acad. of Eng'g, *supra*, at 71–72. The National Academy of Engineering explained the problem was widespread throughout the industry, noting that one of the primary mechanisms in blowout preventers—blind-shear rams— functioned as intended "no better than 50 percent" of the time.  *Id.* at 55.  The National Academy of

Engineering accordingly recommended that blowout preventer systems "be redesigned to provide robust and reliable cutting, sealing, and separation capabilities for the drilling environment to which they are being applied and under *all* foreseeable operating conditions of the rig on which they are installed." *Id.* at 73 (emphasis added).  It also recommended regulations to "require that emergency [blowout preventer] reliability be empirically demonstrated by impartial testing under the most demanding conditions that would be encountered in an emergency." *Id.* at 52.

103.    The National Academy of Engineering, National Commission, and other panels also recommended several additional technical measures that the government should require to address systemic design and operation flaws that could contribute to blowouts and losses of well control.

**IV.    BSEE Enacts Many of the Recommended Regulations in the 2016 Well Control Rule.**

104.    BSEE initiated a rulemaking in 2015 to implement many of the expert panel recommendations in an effort to minimize the risk of future well control incidents.  80 Fed. Reg. 21,504 (Apr. 17, 2015).

105.    BSEE cited four investigations in particular that had "significant bearing" on the rulemaking: those by the Department of Interior/Department of Homeland Security Joint Investigation, the National Commission, the Chief Counsel for the National Commission, and the National Academy of Engineering.  *Id.* at 21,507–08.

106.    BSEE also drew from its meetings with "industry, academia, and other stakeholders," as well as from "significant input and specific recommendations from industry groups, operators, equipment manufacturers, and environmental organizations." *Id.* at 21,508–09.

107.    Based on those investigations and stakeholder input, BSEE focused its rulemaking on the "prevention of blowouts, either through precautionary measures or by operation of a [blowout preventer]." *Id.* at 21,509.  BSEE concentrated on six well control measures: blowout preventer shearing requirements, equipment reliability and performance, third-party verification, failure reporting/near-miss reporting, safe drilling practices, and blowout preventer testing.  *Id.* at 21,509–11.

108.    After an extensive public process, BSEE determined that there were significant benefits to clarifying and strengthening existing well control regulations and, accordingly, issued the

final 2016 Well Control Rule on April 29, 2016.  81 Fed. Reg. 25,888 (Apr. 29, 2016).  The final 2016 Well Control Rule revised or added 66 provisions to BSEE's OCSLA regulations at 30 C.F.R. Part 250.  *See id.* at 26,013–38.

### A.   New Requirements to Ensure Safety

#### 1.   Drilling practices

109.   BSEE implemented two primary systematic mechanisms recommended by the *Deepwater Horizon* panels to make drilling practices safer: prescribing shore-based monitoring of drilling operations in real-time and requiring drilling operators to maintain a specified "safe drilling margin."

110.   BSEE required drilling operators to employ a safe drilling margin of at least 0.5 pound per gallon (ppg) to reduce the risk of sudden changes in well pressure that could cause a blowout.  *Id.* at 26,017 (codified at 30 C.F.R. § 250.414(c)).  If drilling operators could not maintain a safe drilling margin, they were required to stop drilling and remedy the situation before resuming operations.  *Id.* at 26,019 (codified at 30 C.F.R. § 250.427(b)).

111.   BSEE prescribed minimum standards for a real-time shore-based monitoring system that would "improve safety and environmental protection significantly" during well operations by allowing onshore personnel to effectively assist the rig crew in identifying and responding to abnormal or unusual well conditions.  *Id.* at 25,839, 25,896, 26,025–26 (codified at 30 C.F.R. § 250.724).  The standards required at a minimum, that the system transmit data as they are gathered to qualified onshore personnel who have the capability to communicate with rig personnel in real time.  30 C.F.R § 250.724(b) (2016).

#### 2.   Blowout preventer performance

112.   BSEE added several new performance requirements for both surface blowout preventers and subsea blowout preventers to ensure they are capable of sealing a well in foreseeable and unforeseeable conditions.

113.   Surface blowout preventers are installed in line with the drilling equipment on the rig and used in shallower waters, whereas subsea blowout preventers are installed at the well opening on the seafloor and used in deeper waters.

114.    BSEE required that both types of blowout preventers "must be capable of closing and sealing the wellbore *at all times*."  *Id.* at 26,026 (emphasis added) (codified at 30 C.F.R. § 250.730(a)); *see also id.* at 26,027 (requiring operator to show that blowout preventer will "achieve an effective seal") (codified at 30 C.F.R. § 250.731(a)).  The agency also required that subsea blowout preventers have redundant shear rams, sufficient hydraulic power on the seafloor, "autoshear" and "deadman" systems capable of shearing and sealing a well when connection to the rig is lost, and a mechanism to center the drill pipe for shearing.  *Id.* at 26,029–31 (codified at 30 C.F.R. § 250.734(a)).  Surface blowout preventers installed on floating rigs after April 29, 2019, were required to meet the same requirements as subsea blowout preventers.  *Id.* at 26,029 (codified at 30 C.F.R. § 250.733(b)).

### 3.    Testing and inspection

115.    To ensure that safety equipment like the blowout preventer would actually function when needed, BSEE enacted a number of testing and inspection requirements.

116.    BSEE required regular blowout preventer pressure testing at least every 14 days, *id.* at 26,032–34 (codified at 30 C.F.R. § 250.737), set minimum standards for testing and inspection (such as requiring for each blowout preventer a Mechanical Integrity Assessment Reports each year and a complete breakdown inspection every five years), *id.* at 26,028–29, 26,032–35 (codified at 30 C.F.R. §§ 250.732(d), .737, .739), and established a regime of BSEE-Approved Verification Organizations ("BAVOs") to oversee equipment testing and inspection, *id.* at 26,020, 26,027–29, 26,031, 26,044–35 (codified at 30 C.F.R. §§ 250.462(e)(1), .731(c), (d), .732, .734(b), .738(b), (m), (o), .739(b)).

117.    BSEE also established procedures for drilling operators to promptly report equipment failures to the agency to enable it to provide timely notifications of potential equipment faults to other operators and equipment manufacturers.  *Id.* at 26,026 (codified at 30 C.F.R. § 250.730(c)); *see* 80 Fed. Reg. at 21,521.

### 4.    Well cementing

118.    BSEE implemented several requirements related to cementing to ensure well integrity.  Specifically, BSEE required the drill team to ensure that the well cement job is adequate

before engaging latching and lockdown mechanisms, and to obtain BSEE approval before taking any remedial actions for an inadequate cement job.  *Id.* at 26,019 (codified at 30 C.F.R. §§ 250.423(a), (b), 428(d)).

> ### 5.   Containment equipment

119.    BSEE required operators to have access and the ability to deploy specified control and containment equipment the agency determined is necessary to help contain a loss of well control under both foreseeable and unforeseeable conditions.  *Id.* at 26,020 (codified at 30 C.F.R. § 250.462(b)).

> ### B.   Factual Findings that Requirements Are Necessary and Ensure Safety

120.    BSEE made factual findings based on substantial evidence that each of these provisions is necessary to ensuring drilling safety and properly functioning equipment, and that the requirements would significantly improve worker safety on offshore oil and gas rigs and reduce the probability of catastrophic environmental damage due to well blowouts, oil spills, or equipment failures.  *E.g.*, *id.* at 25,839, 25,894–96, 25,922, 25,944, 25,948, 25,952–56, 25,990; 80 Fed. Reg. at 21,508–10, 21,521–22.

121.    BSEE concluded, "By taking no regulatory action, BSEE would leave unaddressed most of the concerns and recommendations that were raised regarding the safety of offshore oil and gas operations and the potential for another well control event with consequences similar to those of the *Deepwater Horizon* incident."  81 Fed. Reg. at 25,991 (citations omitted).

122.    BSEE concluded through a quantitative risk analysis that the safety value of the 2016 Well Control Rule outweighed its costs.  BSEE, *Regulatory Impact Analysis for 2016 Well Control Rule, RIN: 1014-AA11*, at 53–76 (Apr. 11, 2016).  In addition to enhancing safety and environmental protection, BSEE found the Rule would result in significant economic benefits to industry and society, including time savings for drilling operators, reductions in oil spills, and reductions in fatalities.  81 Fed. Reg. at 25,889, 25,985–89.

123.    BSEE also addressed industry concerns about the 2016 Well Control Rule's regulatory burden and costs, revising several provisions in response.  *E.g.*, *id.* at 25,916, 25,938.  For other provisions industry claimed as potentially burdensome, BSEE made factual findings supported

1   by substantial, quantitative evidence that the provisions would not pose an undue burden.  *E.g.*, *id.* at

2   25,891, 25,895, 25,947–48, 25,986.  BSEE ultimately calculated that the 2016 Well Control Rule

3   would produce cost benefits to industry in the form of time savings that would, over ten years,

4   exceeded the overall costs to industry from the rule.  *Id.* at 25,889, 25,985–86.

5        124.    While developing and codifying the technological requirements into its Part 250

6   regulations, BSEE made findings that these requirements constituted the best available and safest

7   that are economically feasible.  *E.g.*, 81 Fed. Reg. at 25,901 (finding that BSEE met BAST

8   principles when developing the 2016 Well Control Rule).

9        **C.**    **Environmental Assessment of the 2016 Well Control Rule**

10        125.    Pursuant to NEPA, BSEE completed an EA for the 2016 Well Control Rule

11   [hereinafter 2016 EA].  BSEE considered in the 2016 EA the assessments of the numerous

12   government-led investigations and independent peer-reviewed scientific research on the events that

13   led to the *Deepwater Horizon* disaster, as well as on the direct, indirect, and ongoing impacts of the

14   oil spill disaster on marine and coastal ecosystems.

15        126.    BSEE concluded that implementation of the 2016 Well Control Rule "will benefit

16   environmental conditions on the [Outer Continental Shelf] and coastal areas by reducing the

17   likelihood and/or severity of oil spills, explosions or equipment failures."  2016 EA, at ii, 2.

18        127.    BSEE assessed the particular sensitivities of the various Outer Continental Shelf

19   regions—Gulf of Mexico, Pacific, and Arctic—in which oil and gas development was occurring or

20   likely to occur in the future.  It determined that a loss of well control in any region could have

21   significant adverse environmental consequences on: air quality; water quality; marine and terrestrial

22   mammals; marine and coastal birds; sea turtles; fish and shellfish; coastal, nearshore, and seafloor

23   habitats; areas of special concern, including essential fish habitat; sociocultural systems and

24   environmental justice; population, employment, and regional income; tourism and recreation;

25   commercial and recreational fisheries; subsistence hunting and fishing; land use and existing

26   infrastructure; and archeological resources.  *Id.* at 7–14.

27

28

128.     Because the new provisions would reduce the risk and/or severity of a loss of well control, BSEE concluded the 2016 Well Control Rule would reduce adverse human health, socioeconomic, and environmental effects resulting from offshore oil and gas operations.  *Id.* at 14.

**V.     BSEE Repeals Critical Provisions of the 2016 Well Control Rule without a Rational Basis or Analysis.**

129.     Although the 2016 Well Control Rule likely has contributed to a reduction in well control incidents and offshore fatalities—with zero losses of well control or fatalities in 2017, after a decade in which each figure averaged approximately five per year—following the change in administration on January 20, 2017, the federal government promptly decided to strip away many of the Rule's protections.

130.     On April 28, 2017—less than one year after BSEE published the 2016 Well Control Rule—President Trump issued Executive Order 13795 directing the Secretary of the Interior to revise the 2016 Well Control Rule to be consistent with the president's new "America-First Offshore Energy Strategy" and eliminate any barriers to expanded offshore oil and gas development.  Exec. Order No. 13795, 82 Fed. Reg. 20,815.

131.     The Secretary of the Interior subsequently directed BSEE to revise the 2016 Well Control Rule to ensure that "exploration and development [of oil and gas on the Outer Continental Shelf] is promoted and not unnecessarily delayed or inhibited."  Sec'y of Interior, Secretarial Order 3350, at 2 (May 1, 2017).

132.     BSEE undertook the review and, after "solicit[ing] input" from industry, identified 59 provisions of the 2016 Well Control Rule that it could revise to "encourag[e] energy exploration and production on the [Outer Continental Shelf] and reduc[e] unnecessary regulatory burdens."  83 Fed. Reg. 22,128, 22,130, 22,132 (May 11, 2018).

133.     BSEE published a proposed rule on May 11, 2018, proposing to repeal or substantially rescind many of the 2016 Well Control Rule's critical provisions, including those prescribing safe drilling practices, containment equipment requirements, blowout preventer shearing requirements, blowout preventer testing and reliability standards, equipment failure and near-miss

reporting, and well cementing standards.  *Id*. at 22,148–60 (proposing to revise, *inter alia*, 30 C.F.R. §§ 250.423, .428, .462, .724, .730, .731, .732, .733, .734, .737, .739).

134.    BSEE stated it was considering additional revisions to safe drilling margin requirements, real-time monitoring standards, and blowout preventer testing intervals, but did not describe proposed revisions to those provisions or provide information in support of any possible revision.  *Id.* at 22,133, 22,137, 22,143 (citing 30 C.F.R. §§ 250.414, .724, .737).  Rather, BSEE solicited suggestions from commenters as to how it should change those provisions.  *Id.* at 22,133, 22,137, 22,143.

135.    BSEE did not provide the public with any data or analyses to support BSEE's claims that particular proposed repeals and revisions would not affect safety or environmental protection. *See, e.g.*, *id.* at 22,133–34, 22,138, 22,140.

136.    Plaintiffs, along with others, submitted comments on the proposed rule, explaining and providing evidence why specific proposed changes will increase the risk of blowouts and losses of well control, and otherwise reduce safety.  Plaintiffs also commented on BSEE's failure to provide fair notice and comment by soliciting suggestions for additional changes, failure to conduct an adequate NEPA analysis, and other statutory violations.

137.    BSEE published a final rule on May 15, 2019, repealing or substantially revising many of the 2016 Well Control Rule's important provisions: 71 in all.  84 Fed. Reg. 21,908 (May 15, 2019).  The Partial Repeal eliminates requirements and standards that had been recommended by the various *Deepwater Horizon* investigative panels and that BSEE previously determined significantly increased safety.  Among other changes, the Partial Repeal weakens standards related to real-time monitoring, blowout preventer functionality, inspection and testing of safety equipment, and maintenance of safe drilling margins.  The Partial Repeal also eliminates much of the new regulatory oversight that had been added under the 2016 Well Control Rule, instead giving industry more leeway to police itself.  In addition, some of the repeals and revisions were not proposed in the proposed rule, including changes to the safe drilling margin requirements, real-time monitoring standards, blowout preventer requirements on floating platforms, and blowout preventer testing intervals.

138.   BSEE's sole justification for the Partial Repeal was to eliminate "unnecessary burdens on stakeholders."  *Id.* at 21,908.

139.   BSEE failed in issuing the Partial Repeal final rule to provide any rational justification for the revisions, to acknowledge or explain why it has disregarded its previous factual findings from the 2016 Well Control Rule, or to meaningfully respond to concerns raised by Plaintiffs in comments on the proposed Partial Repeal.

### A.   Weakened Safety Standards

#### 1.   Drilling practices

140.   BSEE revised the real-time monitoring standards in the final rule to eliminate the requirements that real-time drilling data be transmitted to personnel onshore and that onshore personnel monitoring the data have the capability to contact rig personnel during operation.  *Id.* at 21,977 (amending 30 C.F.R. § 250.724(b), (c)).  These changes were not suggested in the proposed rule.  And BSEE does not in the final rule explain how eliminating the standards will still ensure effective functionality of real-time monitoring systems.

141.   BSEE revised the drilling margin requirements in the final rule to facilitate obtaining waivers from the default requirement and to allow operators to continue drilling in accordance with API Bulletin 92L when the minimum safe drilling margin cannot be maintained.  *Id.* at 21,973–74 (amending 30 C.F.R. §§ 250.414(c)(2), .427(b)).  These changes were not suggested in the proposed rule.  And BSEE did not in the final rule explain why facilitating deviation from the default requirements will continue to ensure the use of safe drilling margins.  Nor did BSEE explain why using API Bulletin 92L—of which the public cannot obtain a copy without paying a fee to an industry trade group—when a safe drilling margin cannot be maintained is as safe or safer than suspending operations to remedy the situation.

#### 2.   Blowout preventer performance

142.   BSEE eliminated the requirements: 1) that blowout preventers be capable of closing and sealing the wellbore "at all times," *id.* at 21,977 (amending 30 C.F.R. § 250.730(a) to require closure only in the event of a "kick"); 2) that blowout preventer rams achieve an effective seal, *id.* at 21,978 (amending 30 C.F.R. § 250.731(a)(5) to require only that rams "close"); and, 3) for subsea

blowout preventers, that emergency function control systems be fail safe designs and that remotely operated vehicles be able to open rams on the blowout preventer, *id.* at 21,980 (amending 30 C.F.R. § 250.734(a)).  BSEE did not explain in the final rule why the changes are needed or how the new regulations will ensure blowout preventers are capable of preventing a blowout under all foreseeable conditions.

143.    BSEE revised the surface blowout preventer requirements on floating facilities in the final rule to exempt existing floating facilities from the remaining blowout preventer requirements. *Id.* at 21,979 (amending 30 C.F.R. § 250.733(b)(1)).  The regulation previously required all new blowout preventers installed after April 29, 2019, on *any* floating facility—new or existing—to comply with the new requirements.  BSEE did not in the proposed rule indicate or suggest that it would amend the regulation to grandfather existing facilities.  BSEE also extended the compliance date for new floating facilities to meet surface blowout preventer requirements from April 29, 2019, to April 29, 2021.  *Id.* at 21,979 (amending 30 C.F.R. § 250.733(b)(1)).  BSEE did not in the final rule explain the need for either change or how the revisions still ensure safety of surface blowout preventers on floating facilities.

### 3.    Testing and inspection

144.    BSEE significantly weakened safety system testing and inspection requirements by: 1) significantly extending the amount of time operators have to complete an investigation of equipment failure, *id.* at 21,978 (amending 30 C.F.R. § 250.730(c)(2)); 2) establishing a new mechanism for failure reporting to be directed to a third-party where it is shielded from BSEE or public oversight, *id.* (amending 30 C.F.R. § 250.730(c)(1), (3), (4)); 3) reducing the required duration for which an operator must demonstrate the system will seal a well from 30 minutes to 5 minutes, *id.* at 21,978–79 (amending 30 C.F.R. § 250.732(a)(2)(ii)); 4) eliminating the requirement that Mechanical Integrity Assessment Reports be produced for each blowout preventer each year, *id.* (repealing 30 C.F.R. § 250.732(d)); and 5) eliminating the requirement to conduct a complete breakdown and physical inspection of the blowout preventer system every 5 years with a BAVO inspector present, *id.* at 21,983 (amending 30 C.F.R. § 250.739).  BSEE did not in the final rule

explain why the changes are needed or whether they will ensure that safety equipment like the blowout preventer would actually function when needed.

145.    BSEE added a provision to the blowout preventer testing regulation in the final rule to permit operators to use a 21-day testing interval instead of a 14-day interval if they meet certain criteria.  *Id.* at 21,981 (amending 30 C.F.R. § 250.737(a)(4)).  BSEE justified the change based solely on data and studies it considered "[f]ollowing closure of the comment period"—most of which were provided in industry comments—that were not available to the public before that closure.  *Id.* at 21,917.  BSEE had not previously proposed or suggested that operators could meet criteria to extend the testing interval or what those criteria might be.  BSEE did not in the final rule explain how the new testing interval will adequately ensure blowout preventers are fully functional and will work in an emergency.

146.    Most broadly, BSEE eliminated the BAVO inspection and oversight regime.  *Id.* at 21,975, 21,978–80, 21,783 (amending 30 C.F.R. §§ 250.462(e)(1), .731(c), (d), .732, .734(b), .738(b), (m), (o), .739(b)).  BSEE did not in the final rule explain why the remaining inspection program will be as rigorous or as effective at ensuring safety equipment is fully functional.

### 4.    Well cementing

147.    BSEE eliminated the requirement to ensure an adequate well cement job *before* engaging latching or lock-down mechanisms.  *Id.* at 21,974 (amending 30 C.F.R. § 250.423).  BSEE did not in the final rule explain whether the change continues to ensure well integrity.

### 5.    Containment equipment

148.    BSEE eliminated the requirement that operators have access to specified well control equipment, instead giving operators discretion as to what equipment to have on-hand.  *Id.* at 21,975–76 (amending 30 C.F.R. § 250.462(b)).  BSEE did not in the final rule explain how providing such discretion will ensure operators have access to all equipment that may be necessary in possible loss of well control scenarios.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.    Unsupported and Inconsistent Findings Regarding Safety under the Partial Repeal**

149.    The regulatory changes in the Partial Repeal final rule are inconsistent with and otherwise disregard BSEE's previous factual findings from the 2016 Well Control Rule.  BSEE did not abandon or otherwise rebut any of those findings in the Partial Repeal.

150.    The changes also are inconsistent with many of the findings by the *Deepwater Horizon* expert panels that BSEE consulted and relied upon in developing the 2016 Well Control Rule.

151.    BSEE had previously found in the 2016 Well Control Rule that each of the provisions now being repealed or revised in the Partial Repeal is an important component of a drilling safety system.  BSEE did not explain how repealing these components is consistent with those previous factual findings.

152.    BSEE also found in the 2016 Well Control Rule that each of the provisions now being repealed or revised in the Partial Repeal increases safety and environmental protection.  By extension, the repeal of any of these provisions would, under BSEE's previous factual findings, decrease safety.

153.    BSEE asserted in the Partial Repeal, however, that none of the repeals or revisions will affect safety or environmental protection.  *E.g.*, *id.* at 21,909.  BSEE provided no factual support or analysis to support these assertions.  And its assertions in the final rule contradict its statements in the final EA [hereinafter 2019 EA] and final Regulatory Impact Analysis [hereinafter 2019 RIA] for the Partial Repeal that many of the revisions *will* affect safety and increase the risk of a blowout.

154.    BSEE did not in the final rule address its factual findings from the 2016 Well Control Rule that each of the provisions it is now repealing or revising increased safety.  BSEE disregarded those findings by asserting that repealing those provisions will not affect safety.  BSEE provided no explanation for disregarding its prior factual findings.

155.    BSEE asserted in the Partial Repeal that each repeal in the final rule is necessary to reduce undue burdens on industry.  *E.g.*, *id.* at 21,910.  BSEE provided no factual support or analysis to support these assertions.

156.     BSEE did not in the final rule address its factual findings from the 2016 Well Control Rule that the Rule provided a net economic benefit to industry and society.  BSEE disregarded those findings in asserting that repealing portions will reduce the overall burden on industry.  BSEE provided no explanation for disregarding its prior factual findings.

157.     BSEE concluded in the 2019 RIA that the Partial Repeal will forego none of the benefits of the 2016 Well Control Rule.  In doing so, BSEE disregarded the benefits it found would result from the provisions enacted in the 2016 Well Control Rule that now will be lost through the Partial Repeal.  The conclusion also conflicts with BSEE's statements elsewhere in the 2019 RIA that several of the revisions will have a "potential impact" on safety and environmental protections.  BSEE provided no explanation for omitting the lost benefits from its Regulatory Impact Analysis and disregarding its prior factual findings.

158.     BSEE also failed to meaningfully respond to many of Plaintiffs' comments on the proposed rule.  BSEE's responses in the final rule generally consist of conclusory statements without offering a factual basis or reasoned analysis.  For example, BSEE responded to Plaintiffs' request to conduct a quantitative risk assessment—as BSEE did for the 2016 Well Control Rule—by disagreeing that such an assessment is the only way to evaluate risk, but without offering any other method or otherwise explaining how BSEE evaluated risk in the final rule.  *Id.* at 21,921.

C.     **Failure to Meet BAST Requirements**

159.     The Partial Repeal removes or revises 71 safety requirements implemented under the 2016 Well Control Rule that BSEE previously found consistent with BAST requirements.  81 Fed. Reg. at 25,901.  Specifically, the Partial Repeal eliminates technological requirements including, but not limited to: 1) source control and containment equipment; 2) real-time monitoring systems; and 3) surface and subsea blowout preventers.  84 Fed. Reg. 21,973–83 (amending 30 C.F.R. §§ 250.462, .724, .730, .733, .734).

160.     BSEE did not evaluate whether the Partial Repeal or each repealed requirement still met BAST requirements or justify that an exception to the BAST requirements was warranted.  Rather, it claimed the BAST statutory requirement does not apply to the rulemaking.  *Id.* at 21,922.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D.      Irrational and Inadequate Assessment of the Partial Repeal's Environmental Effects**

161.    BSEE issued the 2019 EA and a Finding of No Significant Impact pursuant to NEPA on the environmental impacts of the Partial Repeal.  BSEE's NEPA analysis did not accurately or adequately assess the direct, indirect, or cumulative impacts of the Partial Repeal on the environment.

**1.      Failure to consider the true environmental effects**

162.    BSEE conceded in the 2019 EA that the Partial Repeal may result in an increased likelihood of accidental blowouts or spill events.  Yet the agency concluded, without support or analysis, that the Partial Repeal's impact would be insignificant as a result of the reduced testing and certification requirements, and assumed compliance with its provisions.

163.    In reaching this conclusion, BSEE relied on inaccurate and unsupported assumptions that the repeals of specific provisions will not affect safety risks.

164.    BSEE did not analyze or rationally assess in the 2019 EA whether the revisions will affect safety.  Specifically, BSEE failed to recognize the Partial Repeal will increase the risk of oil spills and losses of well control due to weakened or eliminated safety requirements governing drilling practices, blowout preventer performance, testing and inspection, well cementing, and containment equipment.  BSEE and other experts previously had determined based on evidence that these requirements are critical for reducing blowouts and spill events.

165.    BSEE also did not analyze or rationally assess in the 2019 EA whether the reduced testing requirements and assumed compliance would actually improve safety and reduce environmental impacts.  Nor did BSEE provide analysis or evidence to show that these purported mitigation measures will be sufficient to offset the impacts from increased oil spill risks such that overall environmental impacts are negligible.  Rather, BSEE stated that these measures "*might partially* offset the potential risk that the equipment will not perform properly."  2019 EA, at 17 (emphasis added).

166.    BSEE's reliance on inaccurate and unsupported assumptions about the Partial Repeal's effect on safety resulted in a failure to evaluate the Partial Repeal's true impacts on water

resources, wildlife, habitat, and air quality, as well as a failure to evaluate the actual cumulative impacts that would occur.

167.    BSEE failed to disclose or analyze the air quality impacts of the Partial Repeal.  This stark omission conflicts with findings of peer-reviewed studies and the 2016 EA.  Specifically, it ignores that significant emissions of hydrocarbons, ozone, carbon monoxide, nitrogen oxide, aerosols, and particulate matter are likely to increase from more frequent oil evaporation and burning as a result of the Partial Repeal.

168.    BSEE concluded in the 2019 EA, without support, that the Partial Repeal will have no or minor impacts to water quality, marine mammals, birds, sea turtles, fish, and essential fish habitat. It asserted that reduced reporting and frequency of safety equipment testing, as well as compliance with the Partial Repeal, could reduce discharges and water degradation that would otherwise impact these natural resources.  The 2019 EA similarly contains a single unsubstantiated statement that the Partial Repeal likely would reduce harm to federally endangered and threatened species.

169.    The 2019 EA lacks quantitative or qualitative analysis to support the above conclusions.  BSEE's conclusions directly contradict the fact-based determinations in the 2016 EA that the 2016 Well Control Rule's measures reduce both routine discharges, as well as the frequency of large oil spills and the attendant amount of degradation and destruction of habitat and harm to species.  BSEE failed to address those inconsistencies or otherwise consider the degree to which eliminating critical safeguards will result in more frequent and larger discharges and oil spills.

170.    BSEE's conclusions in the 2019 EA also are contrary to the evidence before the agency regarding the likely impacts from oil spills resulting from the Partial Repeal.  Plaintiffs submitted evidence to BSEE from recent peer-reviewed and federal scientific analyses showing that habitats including oyster reefs, seagrass beds, beaches, tidal mud flats, mangroves, marshes, and wetlands are at risk of contamination from oil spills.  BSEE failed to consider or acknowledge these studies and their findings in the context of the increased spill risk resulting from the Partial Repeal.

171.    Finally, BSEE provided no rational explanation or evidence to support its statements in the 2019 EA that eliminating requirements to obtain BSEE approvals in certain circumstances will reduce overall environmental impacts by reducing rig downtime.

FIRST AMENDED COMPLAINT

### 2.     Failure to consider proper geographic scope and variation

172.     BSEE applied an impermissibly narrow geographic scope to its consideration in the 2019 EA of direct and indirect effects of the action.  BSEE discussed impacts from oil and gas development activities under the Partial Repeal in the Gulf of Mexico, Alaska, and California regions only.  However, President Trump has also ordered consideration of annual lease sales in the Mid- and South Atlantic, *see* Exec. Order No. 13795, 82 Fed. Reg. 20,815, and Interior has proposed oil and gas development on the Atlantic and northern Pacific coasts.  In addition, the Trump administration has recently permitted seismic activities—a precursor to oil and gas exploration and production—to "take" marine mammals off the Atlantic coast.  BSEE failed to consider the impacts of reasonably foreseeable oil and gas development under the Partial Repeal on the Atlantic and northern Pacific coasts.

173.     Moreover, BSEE applied a uniform analysis of environmental effects across regions in the 2019 EA.  BSEE failed to consider the variations in habitats and species among regions, or how environmental impacts of the Partial Repeal may vary across the diverse regions of the outer continental shelf.

### 3.     Inadequate cumulative impacts analysis

174.     BSEE stated in the 2019 EA, without support, that it does not expect any material cumulative effects on outer continental shelf resources.  BSEE offered no indication of how it made that determination.

175.     The 2019 EA's sole focus on outer continental shelf resources also impermissibly narrows the geographic scope of its already limited analysis.  As a result, BSEE provided no analysis or conclusions on the cumulative impacts to a vast geographic area encompassing shorelines, wetlands and other coastal communities.

176.     The degree of environmental impacts resulting from the Partial Repeal necessarily depends on the number of oil and gas activities that will occur governed by the revised rules.  The 2019 EA's cumulative impacts analysis fails to consider the foreseeable magnitudes of oil and gas activity levels in the different regions and what the sum total environmental impacts of the Partial Repeal will be under those activity levels.

177.    BSEE also failed to consider, based on the evidence, that eliminating safety requirements likely exacerbates impacts of past, present, and reasonably foreseeable future actions within the affected areas.  For example, BSEE failed to consider the cumulative impacts of the Partial Repeal with the existing impairment of Gulf of Mexico waters by other sources of oil contamination (such as drilling operations, petrochemical facilities, and urban and agricultural runoff).  Oil spills resulting from the Partial Repeal would exacerbate the harm from existing pollutants.

### 4.    Incorrect determination of non-significance

178.    BSEE incorrectly concluded the Partial Repeal will have no significant impact on the environment based on an inaccurate assessment of NEPA's factors for determining significance. BSEE thereby failed to account for the significance of impacts to water resources, habitat, wildlife, and air quality when opting to conduct an EA—as opposed to an EIS—and issuing a Finding of No Significant Impact.

179.    Specifically, BSEE's statements that harm to federally protected marine mammals and sea turtles from oil spills is "temporar[y]" and that compliance with the Partial Repeal likely would reduce harm are contrary to the evidence before the agency.  BSEE failed to consider, for example, that the survival of species in the Gulf of Mexico already has been compromised by the long-term impacts the *Deepwater Horizon* spill and other discharges, or that the National Marine Fisheries Service recently listed the Gulf of Mexico Bryde's whale as an endangered species due to threats from "energy exploration, development, and production, oil spills and oil spill responses." 84 Fed. Reg. 15,446, 15,485 (Apr. 15, 2019).

180.    BSEE acknowledged in the 2019 EA that an increased spill risk would adversely affect federal protected marine sanctuaries, shorelines, and other areas of special concern with highly sensitive ecosystems—including, but not limited to Flower Garden Banks National Marine Sanctuary, Channel Islands National Marine Sanctuary, Cape Hatteras National Seashore, and the Canadian-managed Ivvavik National Park, Herschel Island Territorial Park, and Kendall Island Bird Sanctuary.  BSEE, however, incorrectly assumed, without support and contrary to the evidence before it, that the Partial Repeal is unlikely to increase the spill risk.

181.    In addition, relaxing safety measures when drilling operations are increasing in new high-pressure, ultra-deepwater environments presents heightened and uncertain risks that BSEE failed to consider.

182.    Further, the massive and ongoing damage to the Gulf of Mexico from the *Deepwater Horizon* disaster, in conjunction with other oil and gas industry impacts to the region, provides a backdrop of significant cumulative impacts associated with a rule that weakens safety and the ability to prevent accidental blowouts and other oil spill events.

183.    There is also a high level of controversy surrounding offshore oil and gas production safety measures, including vocal disagreement about the need for additional safety requirements and the degree to which particular measures affect safety.

184.    The significance factors, accurately described and properly assessed, indicate that the Partial Repeal likely will significantly affect the environment, requiring preparation of an EIS.

**E.    Failure to Consider Effects on Threatened and Endangered Species**

185.    BSEE did not accurately or adequately assess the effects of the Partial Repeal on threatened or endangered species or critical habitat.  It simply offered a conclusory assertion that the Partial Repeal "would not affect either individuals of threatened and endangered species or their critical habitat."  2019 EA, at 18–19.

**1.    Threatened and endangered species and critical habitat in areas governed by the Partial Repeal**

186.    Dozens of ESA-listed species and critical habitats are found in or near the Outer Continental Shelf regions that are governed by the Partial Repeal.

187.    Endangered or threatened species found in or near the Pacific Outer Continental Shelf include: fin whale (*Balaenoptera physalus*), sei whale (*Balaenoptera borealis*), sperm whale (*Physeter microcephalus*), North Pacific right whale (*Eubalaena japonica*), blue whale (*Balaenoptera musculus*), humpback whale (Central America and Mexico Distinct Population Segments ("DPS")) (*Megaptera novaeangliae*), Guadalupe fur seal (*Arctocephalus townsendi*), southern sea otter (*Enhydra lutris nereis*), leatherback sea turtle (*Dermochelys coriacea*), olive ridley sea turtle (*Lepidochelys olivacea*), hawksbill sea turtle (*Eretmochelys imbricate*), green sea turtle

(East Pacific DPS) (*Chelonia mydas*), loggerhead sea turtle (North Pacific DPS) (*Caretta caretta*), light-footed Ridgway's rail (*Rallus obsoletus*), western snowy plover (*Charadrius nivosus nivosus*), marbled murrelet (*Brachyramphus marmoratus*), California least tern (*Sterna antillarum browni*), steelhead (Southern California DPS) (*Oncorhynchus mykiss*), black abalone (*Haliotis cracherodii*), and white abalone (*Haliotis sorenseni*).  The area also encompasses designated critical habitats for the leatherback sea turtle, western snowy plover, and black abalone.

188.    Endangered or threatened species found in or near the Alaska Outer Continental Shelf include: polar bear (*Ursus maritimus*), Arctic ringed seal (*Phoca (pusa) hispida*), bearded seal (*Erignathus barbatus*), Steller sea lion (*Eumetopias jubatus*), northern sea otter (*Enhydra lutris kenyoni*), short-tailed albatross (*Phoebastria (Diomedea) albatrus*), spectacled eider (*Somateria fischeri*), Steller's eider (*Polysticta steller*), blue whale, fin whale, humpback whale (Mexico and Western North Pacific DPSs), North Pacific right whale, Western North Pacific gray whale (*Eschrichtius robustus*), sei whale, beluga whale (Cook Inlet DPS) (*Delphinapterus leucas*), bowhead whale (*Balaena mysticetus*), and sperm whale.  Critical habitats for the North Pacific right whale, Cook Inlet beluga, and Steller sea lion also have been designated in or near the Alaska Outer Continental Shelf.

189.    Endangered or threatened species found in or near the Atlantic Outer Continental Shelf include: North Atlantic right whale (*Eubalaena glacialis*), blue whale, fin whale, sei whale, sperm whale, West Indian manatee (*Trichechus manatus*), hawksbill sea turtle, Kemp's ridley sea turtle (*Lepidochelys  kempii*), leatherback sea turtle, green sea turtle (North Atlantic DPS), loggerhead sea turtle (Northwest Atlantic DPS), piping plover (*Charadrius melodus*), roseate tern (*Sterna dougallii*), Bermuda petrel (*Pterodroma cahow*), smalltooth sawfish (*Pristis pectinate*), Atlantic sturgeon (all five DPSs) (*Acipenser oxyrhynchus oxyrhynchus*), and shortnose sturgeon (*Acipenser brevirostrum*).  Critical habitats have been designated in or near the Atlantic Outer Continental Shelf for the loggerhead sea turtle, elkhorn (*Acropora palmata*) and staghorn (*Acropora cervicornis)* corals, and North Atlantic right whale.

190.    Endangered or threatened species found in or near the Gulf of Mexico Outer Continental Shelf include: fin whale, sei whale, sperm whale, blue whale, and Gulf of Mexico

Bryde's whale (*Balaenoptera brydei*), West Indian manatee, green sea turtle (North Atlantic DPS), hawksbill sea turtle, leatherback sea turtle, Kemp's ridley sea turtle, loggerhead sea turtle (Northwest Atlantic DPS), Alabama beach mouse (*Peromyscus polionotus ammobates*), Choctawhatchee beach mouse (*Peromyscus polionotus*), St. Andrew beach mouse (*Peromyscus polionotus peninsularis*), Perdido Key beach mouse (*Peromyscus polionotus trissyllepsis*), piping plover, wood stork (*Mycteria americana*), Everglades snail kite (*Rostrhamus sociabilis*), Cape Sable seaside sparrow (*Ammodramus maritimus mirabilis*), roseate tern, whooping crane (*Grus americana*), giant manta ray (*Mobula birostris*), oceanic whitetip shark (*Carcharhinus longimanus*), Gulf sturgeon (*Acipenser oxyrhynchus desotoi*), pallid sturgeon (*Scaphirhynchus albus*), smalltooth sawfish, rough cactus coral (*Mycetophyllia ferox*), pillar coral (*Dendrogyra cylindricus*), lobed star coral (*Orbicella annularis*), mountainous star coral (*Orbicella faveolata*), boulder star coral (*Montastraea annularis*), elkhorn coral (*Acropora palmata*), staghorn coral (*Acropora cervicornis*), beach jaquemontia (*Jacquemontia reclinata*), Florida perforate cladonia (*Cladonia perforata*), Garber's spurge (*Chamaesyce garberi*), Key tree cactus (*Pilosocereus robinii*), and beautiful pawpaw (*Deeringothamnus pulchellus*).  Critical habitats have been designated in or near the Gulf of Mexico Outer Continental Shelf for the Gulf sturgeon, whooping crane, piping plover, and loggerhead sea turtle.

### 2.      Potential effects on ESA-listed species and critical habitats

191.     As noted above, the Partial Repeal increases the risks of oil spills and loss of well control incidents due to weakened or eliminated safety requirements.  These risks are increased in all Outer Continental Shelf areas where oil and gas exploration and development is occurring or is reasonably foreseeable, including the Pacific, Alaska, Atlantic, and Gulf of Mexico regions.

192.     Oil spilled into the marine environment can seriously harm or kill threatened and endangered wildlife in that environment, including marine mammals, sea turtles, fish, shellfish, corals, and seabirds.  Chemical dispersants deployed in response to oil spills also can cause serious harm to or kill marine wildlife.

193.     Oil from offshore spills and chemical dispersants deployed offshore can flow to coastal and estuarine habitats, and seriously harm or kill wildlife and vegetation in those habitats, including birds, manatees, fish, beach mice, and marsh and beach plants.

194.     Both oil and chemical dispersants can seriously degrade critical habitats in both coastal and offshore areas.

195.     The harms from oil spills to threatened and endangered species and their critical habitats can be acute and short-term in nature, or occur in a more persistent, long-term manner.  In fact, harms from the 2010 *Deepwater Horizon* oil spill persist to this day.

196.     For example, endangered and threatened whales, seals, polar bears, and other marine mammals may consume or inhale oil and chemical dispersants, consume oil- or dispersant-contaminated prey, or have oil and dispersants attach to their skin or fur when swimming through the contaminants.  Such exposure to oil and dispersants causes increased death rates, impaired reproduction, decreased immune system function, lethargy, and brain lesions.  Inhaling oil during surfacing can cause whales to lose consciousness and drown.  Sea otters, polar bears, seals, and other marine mammals are unable to properly thermoregulate when oil becomes stuck in their fur, threatening the animals with hypothermia.

197.     Endangered and threatened birds can become coated in spilled oil, which causes them to lose the ability to fly, dive for food, or float on the water, leading to drowning, starvation, or hypothermia.

198.     Endangered and threatened sea turtles also can ingest or become coated in spilled oil and chemical dispersants, both in the water and on nesting beaches.  Oil exposure in sea turtles causes reduced egg hatchings, reduced hatchling survival, inhibited hatchling access to water, and inhibited adult access to nesting sites.

199.     Additionally, spill response activities on shorelines or at sea, such as collecting and burning oil, skimmer operations, boom deployment, berm construction, and boat traffic also can directly injure or cause harmful behavioral changes in threatened and endangered species.

200.     BSEE acknowledged that the Partial Repeal "is expected to have minor adverse impacts" to the environment in which the above-listed protected species and critical habitats are

found.  2019 EA, at 17.  However, BSEE incongruously asserted the Partial Repeal "would not affect" the species or their critical habitats with no further analysis.  *Id.* at 18–19.

201.   Regardless whether BSEE was correct in classifying the adverse impacts as "minor," the Partial Repeal at the very least *may* affect dozens of threatened and endangered species, as well as designated critical habitats, thereby triggering ESA Section 7 consultation.

### 3.   Failure to consult and insure against jeopardy under the ESA

202.   As Plaintiffs explained in their comments on the proposed Partial Repeal, BSEE was required to consult with the wildlife services to insure against jeopardy and adverse modification under Section 7 of the ESA because the Partial Repeal may affect threatened and endangered species and critical habitats.

203.   BSEE affirmatively decided not to initiate ESA consultation because it "determined that the final rule will have 'no effect' on listed species or designated critical habitat."  84 Fed. Reg. at 21,921.

### CLAIMS FOR RELIEF

**I.   FIRST CAUSE OF ACTION – Failure to provide a rational basis for the Partial Repeal, in violation of the APA and OCSLA**

204.   Plaintiffs reallege and incorporate by reference the allegations made in paragraphs 1–203.

205.   The Partial Repeal final rule is a final agency action for which there is no other adequate remedy in a court.  *See* 5 U.S.C. § 704.

206.   BSEE is obligated to ensure through its regulations that offshore oil and gas operations are subject to safeguards necessary to protect safety, health, and the environment. 43 U.S.C. §§ 1334(a), 1347(b).

207.   An agency rule is arbitrary and capricious under the APA when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.

208.     Moreover, an "agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change." *Id.* at 42.  The agency must demonstrate 1) that a new rule is permissible under the statute, 2) that there are good reasons for it, and 3) that the agency believes it to be better. *Organized Vill. of Kake*, 795 F.3d at 966.  "[E]ven when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation." *Id.* at 968.  When a new regulation rests upon a factual finding contrary to prior policy, an agency must provide a more detailed justification than what would suffice if the new policy were created on a blank slate.  Any unexplained inconsistency between the prior rule and its replacement is a basis for finding the agency's interpretation arbitrary and capricious.

209.     The Partial Repeal fails to meet these requirements.

210.     BSEE had previously concluded, based on extensive scientific information and data, that the 2016 Well Control Rule's provisions would significantly improve worker safety on offshore oil and gas rigs and reduce the probability of catastrophic environmental damage due to well blowouts, oil spills, or equipment failures. *E.g.*, 81 Fed. Reg. at 25,894, 25,990.  BSEE also concluded that the provisions are "necessary" to ensure safety. *See generally id.* at 25,892–997; 80 Fed. Reg. at 21,507–48.  And BSEE determined, based on quantitative economic analyses, that the 2016 Well Control Rule's provisions do not pose an undue burden and, in fact, would provide a net cost benefit to industry. *See generally* 81 Fed. Reg. at 25,902–26,002.

211.     BSEE reversed course when it issued the Partial Repeal, which substantially repeals safety requirements in more than 13 of the regulatory sections that BSEE had enacted in the 2016 Well Control Rule.  84 Fed. Reg. 21,973–83 (amending 30 C.F.R. §§ 250.414, .423, .427, .462, .724, .730, .731, .732, .733, .734, .737, .738, .739).

212.     The Partial Repeal deviates from the carefully crafted agency policy in the 2016 Well Control Rule that helped ensure worker safety and reduce the probability of a catastrophic oil spill. It reverts to a similar regulatory scheme for many critical safety components that BSEE had previously determined creates "the potential for another well control event with consequences similar to those of the *Deepwater Horizon* incident."  81 Fed. Reg. at 25,991.

213.    BSEE failed to supply a reasoned analysis or support for the changes (including, but not limited to amendments of 30 C.F.R. §§ 250.414, .423, .427, .462, .724, .730, .731, .732, .733, .734, .737, .738, .739), or for its justification for the Partial Repeal, in violation of the APA. 5 U.S.C. § 706(2).

214.    BSEE asserted that repealing safety provisions (including, but not limited to portions of 30 C.F.R. §§ 250.414, .423, .427, .462, .724, .730, .731, .732, .733, .734, .737, .738, .739) through the Partial Repeal still "maintains safety and environmental protection." *E.g.*, 84 Fed. Reg. at 21,909.  These conclusions are unsupported by evidence or scientific analysis, "run[] counter to the evidence before the agency," and fail to consider significant problems raised in comments on the proposed rule. *State Farm*, 463 U.S. at 43.  These conclusions also disregard without a "reasoned explanation" BSEE's prior factual findings that the provisions substantially reduce the risk of fatalities and oil spills, and are "necessary" to ensuring safety and environmental protection. *Organized Vill. of Kake*, 795 F.3d at 968.

215.    BSEE asserted that repealing the safety provisions (including, but not limited to portions of 30 C.F.R. §§ 250.414, .423, .427, .462, .724, .730, .731, .732, .733, .734, .737, .738, .739) through the Partial Repeal will "reduce unnecessary burdens" on industry. *E.g.*, *id.* at 21,910. This conclusion is unsupported by evidence or scientific analysis, "runs counter to the evidence before the agency," and fails to consider significant problems raised in comments on the proposed rule. *State Farm*, 463 U.S. at 43.  This claim also disregards BSEE's prior factual findings that the provisions would not pose an undue burden and would, in fact, provide a net cost benefit to industry. BSEE provided no "reasoned explanation" for disregarding those factual findings. *Organized Vill. of Kake*, 795 F.3d at 968.

216.    BSEE's failures to articulate a rational connection between the facts found and its choice, to consider all important aspects of the issue, and to provide an adequate and detailed justification for the changes the Partial Repeal made to existing regulations render the final rule arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law with the meaning of the APA.  5 U.S.C. § 706(2).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    SECOND CAUSE OF ACTION – Failure to provide fair notice of and opportunity for public participation in rulemaking, in violation of the APA

217.    Plaintiffs reallege and incorporate by reference the allegations made in paragraphs 1–203.

218.    The APA requires that BSEE give the public adequate notice of any rulemaking. 5 U.S.C § 553(b).  To be adequate, notice must include "the terms or substance of the proposed rule or a description of the subjects and issues involved."  *Id.*  In addition, notice can only be deemed adequate if a final rule's specific provisions are a "logical outgrowth" of the proposed rule.  *Small Refiner Lead Phase-Down Task Force*, 705 F.2d at 543.

219.    The APA also requires that BSEE give interested persons a meaningful "opportunity to participate in the rule making through submission of written data, views, or arguments."  5 U.S.C. § 553(c).  To ensure that the public comment opportunity is meaningful, BSEE must first "disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based."  *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977).

220.    BSEE did not in the proposed Partial Repeal state the terms or substance of its final revisions to the safe drilling margin standards, real-time monitoring requirements, surface blowout preventer requirements for floating facilities, or blowout preventer testing interval.  BSEE's general requests for comments on topics or potential additional changes to these provisions, disconnected from any specific proposals, did not provide fair notice of how the agency actually planned to amend those provisions.

221.    The revisions to the safe drilling margin standards, real-time monitoring requirements, surface blowout preventer requirements for floating facilities, and blowout preventer testing interval that BSEE adopted in the Partial Repeal final rule are not logical outgrowths of the vague statements and requests for suggestions in the proposed Partial Repeal.

222.    BSEE's revisions to the safe drilling margin standards, real-time monitoring requirements, surface blowout preventer requirements for floating facilities, and blowout preventer testing interval, 84 Fed. Reg. at 21,973–74, 21,977, 21,979, 21,981 (amending 30 C.F.R.

§§ 250.414(c)(2), .427(b), .724(b), .733(b)(1), .737(a)(4)), therefore violate the APA's fair notice requirement.  5 U.S.C. § 553(b).

223.   BSEE did not in or with the proposed Partial Repeal provide the data or technical information on which the rule is based, including, but not limited to: the bases for the agency's statements that the proposed Partial Repeal would ensure safety and environmental protection, that specific revisions (including, but not limited to changes to 30 C.F.R. §§ 250.414, .423, .427, .462, .724, .730, .731, .732, .733, .734, .737, .738, .739) would not undermine safety, and that oil and gas operators would voluntarily adopt safe technology and practices absent regulatory requirements.

224.   In the proposed Partial Repeal, BSEE solicited data and evidence from industry to provide support for the proposed revisions.  BSEE did not and could not make the data it received available to the public in advance of the sole public comment period on its proposal.

225.   BSEE based the Partial Repeal final rule on data and technical information it did not disclose to the public before or during the opportunity for public participation, in violation of the APA's meaningful public participation requirement.  5 U.S.C. § 553(c).

226.   BSEE relied on and ultimately incorporated by reference API Bulletin 92L in the Partial Repeal final rule.  Because the public cannot access API Bulletin 92L without paying a trade group a substantial fee or surrendering certain rights, API Bulletin 92L was not readily available to the public during the comment period.  BSEE's reliance on and incorporation by reference of API Bulletin 92L accordingly also violate the APA's meaningful public participation requirement.  *Id.*

227.   BSEE's failure to provide the public adequate notice of rulemaking or an adequate opportunity to participate in the rulemaking is an abuse of discretion, not in accordance with law, and without observance of procedure required by law with the meaning of the APA.  5 U.S.C. § 706(2).

### III.   THIRD CAUSE OF ACTION – Failure to require the use of the best available and safest technology, in violation of the APA and OCSLA

228.   Plaintiffs reallege and incorporate by reference the allegations made in paragraphs 1–203.

229.     OCSLA obligates BSEE to "require . . . the use of the best available and safest technologies" on all new and existing offshore drilling and production operations.  43 U.S.C. § 1347(b).  OCSLA allows BSEE to permit the use of technology that is not BAST on new operations only if the agency determines "that the incremental benefits are *clearly* insufficient to justify the incremental costs of utilizing such technologies."  *Id.* (emphasis added).  OCSLA allows BSEE to permit the use of technology that is not BAST for existing operations only if the agency determines that the operator has shown the technology's use is not "practicable" or the agency determines "that the incremental benefits are *clearly* insufficient to justify the incremental costs of utilizing such technologies."  *Id.* (emphasis added).

230.     BSEE's regulations further require that operators implement BAST for all new operations and existing operations where practical by, among other things, conforming with BSEE regulations.  30 C.F.R. § 250.107(c).

231.     BSEE's enactment of the 2016 Well Control Rule codified the required use of economically feasible technologies that significantly improved safety.  In finalizing the 2016 Rule, BSEE found that the rule complied with BAST requirements.  *E.g.*, 81 Fed. Reg. at 25,901.  *See also* 30 C.F.R. § 250.107(c).

232.     The Partial Repeal eliminates 71 of the 2016 Well Control Rule's requirements, specifically technologies required for source control and containment equipment, real-time monitoring systems, and surface and subsea blowout preventers.  84 Fed. Reg. 21,973–83 (amending 30 C.F.R. §§ 250.462, .724, .730, .733, .734).

233.     BSEE refused to evaluate, make any findings, or otherwise ensure that elimination of these 71 requirements, which BSEE previously found to be the best available and safest, complied with BAST requirements when developing and finalizing the Partial Repeal.  *E.g.*, 84 Fed. Reg. at 21,922.  BSEE's arbitrary failure to evaluate whether the Partial Repeal complied with BAST requirements violated its statutory obligation to require use of the best available and safest technologies.  43 U.S.C. § 1347(b).

234.     In addition, 30 C.F.R. § 250.107(c) confirms that newly adopted improved safety requirements in BSEE's regulations – here, those enacted in the 2016 Well Control Rule – are

BAST.  By eliminating these safety requirements in the Partial Repeal, and adopting measures that BSEE has failed to ensure are the best available or safest, the Partial Repeal conflicts with the presumption in 30 C.F.R. § 250.107(c)(2) that operators' conforming implementation of these and other standards ensures the use of BAST in the field.  As a result, BSEE cannot meet its statutory obligation to require operators "use the best available and safest technologies." 43 U.S.C. § 1347(b).

235.   BSEE further did not demonstrate that it could meet the statutory exception to its BAST obligations by showing that the incremental benefits of BAST technology in the 2016 Well Control Rule are "clearly insufficient to justify the incremental costs of utilizing such technologies." 43 U.S.C. § 1347(b).  Nor did BSEE determine or assess whether the use of any 2016 Well Control Rule technology in an existing operation is not "practicable."  *Id.*  BSEE expressly declined to make either such determination in the Partial Repeal.  84 Fed. Reg. at 21,922 ("[I]n this rule, the Secretary has not undertaken any BAST evaluation of economic feasibility of any specific technology.").

236.   BSEE's promulgation of the Partial Repeal therefore violates OCSLA, 43 U.S.C. § 1347(b), and is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706(2).

IV.   **FOURTH CAUSE OF ACTION – Failure to take a hard look at the environmental effects of the action, in violation of NEPA and the APA**

237.   Plaintiffs reallege and incorporate by reference the allegations made in paragraphs 1–203.

238.   NEPA requires agencies take a "hard look" at the environmental consequences of their actions.

239.   To that end, the NEPA analysis must fully consider and disclose the potential environmental impacts of the proposed action, including the direct, indirect, and cumulative effects, as well as alternatives to that action.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.4, 1502.1(b), (c), 1502.5, 1508.7, 1508.8, 1508.25, 1508.27.

240.   NEPA requires agencies to use high-quality, accurate scientific information and to ensure the scientific integrity of their analyses.  40 C.F.R. §§ 1500.1(b), 1502.24.

241.     BSEE relied on the 2019 EA in reaching its decision to issue the Partial Repeal final rule.

242.     BSEE's conclusions in the 2019 EA that the environmental impacts of the Partial Repeal would be insignificant were based on incorrect and unsubstantiated assumptions that the Partial Repeal would not increase the risks of blowouts, losses of well control, or oil spills.  The assumptions are counter to BSEE's prior findings in the 2016 Well Control Rule and 2016 EA that the provisions now being repealed would increase safety.  They also are counter to recent peer-reviewed scientific investigations demonstrating significant environmental impacts resulting from oil spills that are likely to occur absent rigorous oil spill prevention safeguards previously implemented under the 2016 Well Control Rule.

243.     The 2019 EA does not acknowledge BSEE's prior findings or recent peer-reviewed scientific evidence of direct, indirect, and cumulative effects likely to result from the Partial Repeal, nor does it contain a reasoned explanation for disregarding those findings and studies.  BSEE provides no reasoned analysis or evidentiary support for its general statements that the Partial Repeal would likely reduce the likelihood of impacts to the environment.

244.     BSEE's inaccurate assumptions regarding the risks of blowouts, losses of well control, and oil spills caused it to irrationally underestimate the environmental impacts of the Partial Repeal.

245.     BSEE's failure to consider the full geographic scope and variation in its effects analysis caused it to inaccurately and incompletely assess the full environmental effects of the Partial Repeal.

246.     BSEE's failure to accurately evaluate the direct, indirect, and cumulative effects of the Partial Repeal violates its duties to use "[a]ccurate scientific analysis" and "high quality" information and to take a hard look at the environmental effects of its actions, in violation of NEPA and its implementing regulations, and is arbitrary and capricious, in violation of the APA. 5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.1(b), 1502.24.

247.     By relying on an EA that fails to meet the requirements of NEPA and its implementing regulations, BSEE's decision to issue the Partial Repeal final rule is arbitrary,

capricious, an abuse of discretion, and not in accordance with law, and without observance of procedures required by law, in violation of NEPA, 42 U.S.C. § 4332, its implementing regulations, and the APA, 5 U.S.C. §§ 701–706.

**V.   FIFTH CAUSE OF ACTION – Failure to complete an EIS, in violation of NEPA and the APA**

248.   Plaintiffs reallege and incorporate by reference the allegations made in paragraphs 1–203.

249.   NEPA requires agencies to complete an EIS for any major federal action that may have a significant effect on the environment, or if there are substantial questions about whether it may significantly impact the environment.  42 U.S.C. § 4332(2)(C).

250.   "Significance" exists if any of the following factors are present: controversy surrounding the impact of the action, the action presents unique or uncertain risks, if the action has cumulatively significant impacts, or if there is a possibility for adverse effects on federally listed species. 40 C.F.R. § 1508.27.

251.   Significant controversy surrounds the impact of the Partial Repeal.  The application of the Partial Repeal in high-pressure, ultra-deepwater operations presents unique and uncertain risks.  The Partial Repeal will have cumulatively significant impacts across all foreseeable drilling operations along nearly the entire coast of the United States.  Scientific evidence and BSEE's prior factual findings demonstrate that significant impacts from oil spills on highly sensitive marine ecosystems and protected species are likely under the Partial Repeal.

252.   BSEE's decision to complete an EA and issue a Finding of No Significant Impact, and its failure to complete an EIS, therefore violates NEPA and is arbitrary and capricious, an abuse of discretion, and not accordance with law, in violation of the APA.  42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706(a)(2).

**VI.   SIXTH CAUSE OF ACTION – Failure to insure that the Partial Repeal will not jeopardize the continued existence of threatened or endangered species, or adversely modify critical habitats, in violation of the ESA**

253.   Plaintiffs reallege and incorporate by reference the allegations made in paragraphs 1–203.

254.    Section 7 of the ESA requires each federal agency, through consultation with the federal wildlife services, to insure that any action the agency takes is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat.  16 U.S.C. § 1536(a)(2).

255.    Under the ESA, agency actions that "may affect" a listed species or critical habitat may not proceed unless and until the federal agency first ensures, through completion of the consultation process, that the action is not likely to cause jeopardy or adverse modification of critical habitat.  16 U.S.C. § 1536(a), (d); 50 C.F.R. §§ 402.14; 402.13.  The threshold for a "may affect" determination and the required ESA section 7(a)(2) consultation is low.  *See* 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement.").

256.    BSEE's issuance of the Partial Repeal is an agency action under the ESA.  *See* 50 C.F.R. § 402.02.

257.    The affected action area includes waters in the Outer Continental Shelf in the Pacific, Atlantic, Gulf of Mexico, and Alaska regions where offshore drilling has been or will be authorized under OCSLA, as well as adjacent and nearby waters and coastlines that may be affected by an oil spill occurring in the Outer Continental Shelf.  By increasing the risks of oil spills and other environmental damage, the Partial Repeal may affect threatened and endangered species and critical habitats in and near areas.

258.    BSEE was required under the ESA to consult with the National Marine Fisheries Service and the U.S. Fish and Wildlife Service regarding the Partial Repeal's effects on threatened and endangered species and critical habitats in the action area.

259.    BSEE did not initiate or complete ESA consultation on the Partial Repeal.

260.    BSEE's determination that its action has "no effect" on listed species is not based on the best scientific and commercial data available and fails to consider the impacts to listed species from increased risk of oil spills and other environmental damage.

261.    BSEE has violated the ESA by issuing the Partial Repeal without the completed, legally-required consultation for this action that "may affect" the species and critical habitats listed

in paragraphs 187–190.  BSEE's failure to consult with the Services to insure that its action is not likely to jeopardize the continued existence of any of the species or result in the destruction or adverse modification of their critical habitats, violates the ESA, 16 U.S.C. § 1536(a)(2), its implementing regulations, and the APA, 5 U.S.C. §§ 701-706.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.      Declare that the Partial Repeal final rule is arbitrary and capricious, an abuse of discretion, and not in accordance with law in violation of the APA, OCSLA, NEPA, and ESA;

2.      Declare that the environmental analysis that BSEE issued in connection with the Partial Repeal final rule is unlawful, in violation of NEPA and its implementing regulations and the APA;

3.      Declare that BSEE is in violation of the ESA by failing to consult under Section 7 or insure that the Partial Repeal will not jeopardize the continued existence of threatened or endangered species, or adversely modify critical habitats;

4.      Vacate the Partial Repeal final rule;

5.      Enter any other appropriate injunctive relief to ensure that Defendants comply with the APA, OCSLA, NEPA, and the ESA, and to prevent irreparable harm to Plaintiffs and to the environment until such compliance occurs;

6.      Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 16 U.S.C. § 1540(g)(4), 28 U.S.C. § 2412, and 43 U.S.C. § 1349(a)(5); and

7.      Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 30th day of August, 2019.

*/s/ Brettny Hardy*
Brettny Hardy (CSB No. 316231)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
T: 415-217-2000  F: 415-217-2040
bhardy@earthjustice.org

1

2

3

4

*/s/ Christopher Eaton*
Christopher Eaton (*pro hac vice*)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104
T: 206-343-7340  F: 206-343-1526
ceaton@earthjustice.org

5

6

*Counsel for Plaintiffs Healthy Gulf, Center for
Biological Diversity, Defenders of Wildlife, and
Friends of the Earth*

7

8

9

10

*/s/ Devorah Ancel*
Devorah Ancel (CSB No. 261038)
Sierra Club
6406 North IH-35, Suite 1806
Austin, TX 78752
T: 415-845-7847  F: 510-208-3140
devorah.ancel@sierraclub.org

11

*Counsel for Plaintiffs Sierra Club and Healthy Gulf*

12

13

14

15

*/s/ David Pettit*
David Pettit (CSB No. 67128)
Natural Resources Defense Council
1314 2nd Street
Santa Monica, CA 90401
T: 310-434-2300  F: 888-875-6868
dpettit@nrdc.org

16

*Counsel for Plaintiff Natural Resources Defense
Council*

17

18

19

20

*/s/ Catherine Wannamaker*
Catherine Wannamaker (*pro hac vice*)
Southern Environmental Law Center
463 King Street, Suite B
Charleston, SC 29403-7204
T: 843-720-5270  F: 843-414-7039
cwannamaker@selcsc.org

21

22

*Counsel for Plaintiffs North Carolina Coastal
Federation and South Carolina Coastal
Conservation League*

23

24

25

I, Brettny Hardy, am the ECF user whose ID and password are being used to file this First Amended Complaint.  Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that ECF users Christopher Eaton, David Pettit, Devorah Ancel, and Catherine Wannamaker have concurred in the filing of this document.

26

Dated August 30, 2019.                     */s/ Brettny Hardy*
                                                              Brettny Hardy

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2019, I caused the foregoing to be filed and served upon counsel of record via the Court's CM/ECF filing system, which will send notice of such to all counsel of record.

/s/ *Brettny Hardy*
Brettny Hardy

FIRST AMENDED COMPLAINT